647 P.2d 1127

Calvin C. SPARKS and Suzanne Sparks, husband and wife, Appellees,

v.

REPUBLIC NATIONAL LIFE INSURANCE COMPANY, a Texas corporation; American Life Pension Health Associates Corporation, an Iowa corporation, dba Alpha Corporation, Planned Security Trust, a trust, Appellants.

No. 15488.

Supreme Court of Arizona, En Banc.

June 10, 1982.

Rehearing Denied July 15, 1982.

Holland & Postal by Robert W. Holland, Phoenix, for appellants.

Jennings, Strouss & Salmon by William T. Birmingham, Richard B. Burnham and Ted A. Schmidt, Phoenix, for appellees.

HAYS, Justice.

This is an appeal by defendants Republic National Life Insurance Company (Republic), American Life Pension Health Associates Corporation (ALPHA), and Planned Security Trust (PST), from a verdict and judgment of the Superior Court of Maricopa County. We have jurisdiction pursuant to 17A A.R.S. Rules of Civil Appellate Procedure, rule 19(e).

In August of 1976, plaintiffs, Calvin and Suzanne Sparks, purchased an air conditioning business in Mesa, Arizona, known as Sun Valley Sales & Air Conditioning, Inc. The business was managed entirely by Calvin Sparks. In April of 1977, Calvin met with Robert Bowden, an insurance agent, in order to secure a health insurance policy for his family and the air conditioning company's employees. Bowden recommended a policy underwritten by Republic, administered by ALPHA and funded through PST. During this meeting, Bowden showed

Sparks a sales brochure written by ALPHA and approved by Republic. The cover of the brochure contained a headline, "Planned Security Trust", "$250,000 Comprehensive Major Medical". The remainder of the brochure explained the general provisions of the policy such as eligibility requirements, special major medical features, exclusion of coverage for preexisting conditions and occurrences which would terminate insurance. The termination of insurance section stated that insurance would be terminated for, among other things, nonpayment of premiums. The brochure also contained a prominently displayed box containing capital letters which informed the reader that a more complete description of benefits would be found in the certificate of insurance issued to insured employees. It also informed the reader that all benefits were subject to the master group policy held by PST.

Consistent with the brochure, Bowden explained that under "Plan I" of the policy, in the event of illness or accident, an employee would pay a $100 deductible and, thereafter, full benefits of up to $250,000 per person would be paid by the insurance company for any additional covered medical expenses. The brochure was the only written document which Calvin Sparks saw before applying for the insurance. Calvin sent his first premium payment on April 1, 1977, along with his application.

Exactly one month after purchasing the insurance, Calvin, Suzanne and their three children flew to Safford to visit relatives. On the return flight to Mesa, the small passenger plane in which they were flying crashed. Calvin sustained permanent brain damage. Kevin, the Sparks' five-year-old son, was rendered a paraplegic, as well as suffering a broken jaw and several facial lacerations. Suzanne and another child received minor injuries.

Because of his injuries and resulting mental impairment, Calvin was unable to manage the air conditioning business. As a result, Sun Valley Sales went bankrupt in December of 1977. Insurance premiums were paid until December 16, 1977, when the business was closed. At that time, the defendants had paid less than $84,000 under the policy for the treatment of all four of the Sparks family injured in the accident.

In January of 1978, Suzanne received a letter from the defendants returning a premium check for underpayment. In February 1978, Suzanne received another letter from ALPHA advising her of new premium charges for the policy and thanking her for doing business with the defendants. Finally, in March 1978, defendants advised Suzanne that they would not pay any further benefits to Calvin or Kevin for expenses or treatment incurred after December 1, 1977. Defendants explained that under the provisions of the policy, when insurance coverage was terminated, defendants were no longer obligated to pay for any medical expenses for an injury or illness which occurred while the insurance was in effect.

After being informed that defendants would no longer pay any medical benefits, Suzanne reviewed the insurance policy which had been provided to her by Bowden *after* the accident. After reading the policy, she was unable to understand whether the policy language limited coverage as asserted by the defendants, so she referred to the sales brochure. Having read the brochure, it was her understanding that "[w]hen the business closed the insurance would no longer cover it, if we had another accident the next day. But I expected coverage for injuries incurred in the accident while the policy was in force."

Because of defendant's refusal to pay further medical benefits, Kevin was forced to forgo needed muscle release surgery on his left thigh. Although the surgery was later performed at the Arizona Children's Hospital in March 1980, the delay resulted in deformity to Kevin's left leg, leaving the leg two inches shorter than the right. Kevin was also unable to obtain braces or crutches due to defendants' refusal to pay benefits. A recent examination of Kevin revealed that his spine had become badly curved due to his confinement in a wheelchair. The Sparkses also were forced to forgo additional medical and psychological care for Calvin. Expert medical testimony

established that both Kevin and Calvin would need continuing treatment throughout their lives.

On January 10, 1980, the Sparkses brought an action alleging breach of contract and various tort claims against the defendants. The plaintiffs sought past and future unpaid insurance benefits under the policy and general and punitive damages arising from defendants' alleged tortious termination of the insurance benefits. At the conclusion of an eight-day jury trial, a verdict was returned against all defendants in the amount of $1,551,000 in compensatory damages and $3,000,000 in punitive damages. The court also awarded attorney's fees to the plaintiffs in the amount of $80,-000.

Defendants raise the following arguments on appeal:

1. The trial court erred by ruling that all contract rights were fixed by the terms of the sales brochure.

2. The trial court erred in instructing the jury on the tort of bad faith.

3. The trial court erred by submitting the tort theories to the jury on the basis of joint and several liability.

4. The trial court erred when it instructed the jury that defendants could be found liable in tort for violation of A.R.S. § 20–443 of the Arizona Insurance Code.

5. The trial court erred when it instructed the jury that Robert Bowden was an agent of the defendants.

6. The trial court's award of $80,000 in attorney's fees violates A.R.S. § 12–341.01 and denied defendants due process of law.

## THE INSURANCE CONTRACT

Defendants' position throughout the litigation has been that the master policy provided that the payment of medical expense benefits would cease upon termination of the insurance coverage. Defendants argue that the trial court committed reversible error by ruling that all contract rights were fixed by the terms of the sales brochure and

not by the insurance contract. Plaintiffs respond by asserting that the trial court ruled that the defendants were contractually liable even if the master policy were considered alone or construed in conjunction with the brochure.

The interpretation of an insurance contract is a question of law to be determined by the Court independent of the findings of the trial court. *State Farm Fire & Casualty Co. v. Rossini*, 107 Ariz. 561, 490 P.2d 567 (1971). On appeal, we will sustain the trial court's ruling on any theory supported by the evidence, even though the trial court's reasoning may differ from our own. *Minderman v. Perry*, 103 Ariz. 91, 437 P.2d 407 (1968). The trial court instructed the jury that defendants had breached their contract with plaintiffs and did not elaborate on the reasoning behind this determination. After examining the provisions of the policy, we agree with the trial court's conclusion.

Provisions of insurance policies are to be construed in a manner according to their plain and ordinary meaning. *Parks v. American Casualty Co. of Reading*, 117 Ariz. 339, 572 P.2d 801 (1977). Where the language employed is unclear and can be reasonably construed in more than one sense, an ambiguity is said to exist and such ambiguity will be construed against the insurer. *Ranger Insurance Co. v. Lamppa*, 115 Ariz. 124, 563 P.2d 923 (App.1977). In determining whether an ambiguity exists in a policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business. *State Farm Mutual Auto Insurance Co. v. O'Brien*, 24 Ariz.App. 18, 535 P.2d 46 (1975).

Defendants direct us to several provisions of the policy that are said to clearly and unequivocally terminate the defendants' obligation to pay insurance benefits to the plaintiffs upon nonpayment of premiums. Section 1 entitled "POLICY TERM" states: "The policy continues from its effective date as long as the premium is paid as herein agreed ..." Section 5 entitled "PERSON'S TERMINATIONS" states, in pertinent part, that the "insurance of the

Insured Person shall terminate" either when the "policy is terminated" or on "the premium due date when the policyholder fails to pay the required premium," whichever is first. Section 23 entitled "MAJOR MEDICAL BENEFITS" states:

"When as the result of Accidental bodily injury or sickness, an Insured Person incurs Covered Expenses shown herein while this insurance is in force as to such person, the Company will pay the applicable percentage, shown in the Schedule of Benefits hereof, of such expenses incurred in excess of the Deductible Amount, not to exceed the Maximum Amount."

Also contained in Section 23 is a heading labeled "EXTENSION OF MAJOR MEDICAL BENEFITS PROVISIONS" which provides as follows:

"If accidental bodily injury is sustained or sickness commences while these Major Medical Benefits are in force as to the Insured Person, Covered Expenses otherwise payable under the policy will be paid for any such expenses incurred as the result of such injury or sickness after the termination of insurance of an Insured Person if from the date of such termination of insurance to the date such Expenses are incurred the Insured Person is wholly and continuously disabled by reason of such accidental bodily injury or sickness. Such benefits shall be payable only during the continuance of such disability but not beyond the earliest of the following dates: (A) three months from the date the insurance of the Insured Person terminated, (B) on the date the Policy is terminated, (C) for persons whose insurance became effective after the effective date of the Master Policy, on the last day of a period equal to the time the Insured Person was insured under these Major Medical Benefits, (D) on the date the Insured Person becomes covered or insured under any other group policy (whether issued by the Company or any other Insurer) or any group basis service or prepayment plan, (E) the reinstatement of Maximum Amount shall not be applicable in the case of any Insured

Persons entitled to benefits in accordance with this provision."

▪ If an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation. *Transamerica Insurance Co. v. McKee*, 27 Ariz.App. 158, 551 P.2d 1324 (1976). Our reading of the foregoing provisions leads us to conclude that the policy is ambiguous and fails to communicate the nature of the limitations urged by defendants.

Initially, it must be pointed out that the sections of the policy which an insured would normally look to in order to ascertain what the policy does *not* cover are silent on the limitations argued by defendants. Under Section 8, "Definitions and Exceptions", the policy states that it does not cover expenses incurred for such things as war, self-inflicted injury, or injury or sickness covered by workmen's compensation. There is no mention that benefits will be terminated when the insurance is terminated. Under Section 23 subheading entitled "LIMITATIONS" the policy states that benefits shall not be payable for cosmetic surgery or treatment for alcoholism or drug addiction. No mention is made of the fact that benefits for injuries incurred while the insurance is in effect will not be paid after the insurance coverage is terminated.

In its statement of facts, defendants point to a provision purportedly contained in the insurance policy which would arguably put an insured on notice that payment of benefits would continue only as long as the insurance was in force. That provision states:

"Notwithstanding any statements to the contrary in the benefits provision of this policy, no accident and sickness benefit payment shall be made for expenses incurred after the date the policy is terminated."

This particular provision, however, was not in the policy ultimately issued to plaintiffs. Without such a provision, the policy language contained in Sections 1, 5 and 23 fall

far short of clearly and distinctly communicating to the insured the nature of the limitation asserted by defendants.

Sections 1 and 5 do nothing to support defendants' argument. They indicate the obvious: if premiums are not paid, the insurance terminates. This can hardly be construed to communicate effectively to the insured that the termination of insurance also terminates the insurers' obligation to pay continuing benefits for an accident or illness which occurred while the insurance was in force.

■■■ The first portion of Section 23, "MAJOR MEDICAL BENEFITS" comes closest to informing the insured that benefits are not payable after termination. However, while an individual clause of an insurance policy, standing alone, might be determined to have no ambiguity, "the policy must be read as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions." *Federal Insurance Co. v. P. A. T. Homes, Inc.*, 113 Ariz. 136, 139, 547 P.2d 1050, 1053 (1976). Moreover, the facts of the present case are uncommon in that the only document which the insured had an opportunity to examine before the loss was the sales brochure, which, in our opinion, also fails to communicate the limitation of coverage urged by defendants. In such a situation, the words of the advertising brochure issued by the insurer should be considered as they affect the ordinary person as to the meaning of the words in the policy itself. *See Craver v. Union Fidelity Life Insurance Co.*, 35 Ohio Misc. 15, 298 N.E.2d 918, *affirmed*, 37 Ohio App.2d 100, 307 N.E.2d 265 (1973); *Weinberg v. Insurance Co. of North America*, 88 Misc.2d 82, 388 N.Y.S.2d 69 (1976); *Morris v. Traveler's Insurance Co.*, 546 S.W.2d 477 (Mo.App.1976); see also 13A Appleman, *Insurance Law & Practice*, § 7534 at 130.[1] When the first portion of Section 23 is read in conjunction with the other provisions of the policy and the sales brochure which both promise maximum benefits of $250,000, the language could also be read to provide that the company will pay expenses, not in excess of the maximum amount, if the injury or sickness occurred while the insurance was in force and the expenses incurred resulted from the injury or sickness.

Finally, that portion of Section 23 entitled "EXTENSION OF MAJOR MEDICAL BENEFITS PROVISIONS" also fails to support defendants' position. The first sentence of the paragraph seemingly provides for continuing payment of benefits after termination of insurance if the insured is "wholly and continuously disabled," but in the next sentence, provides that benefits will be terminated if the policy is terminated. Not only is this paragraph contradictory, and the supposed limitation hidden under a title which is misleading, but it illustrates that the policy provides no protection to a disabled insured.[2] None of the forego-

1. Defendants maintain that we have already held that the provisions of a group insurance policy control over the information contained within a sales brochure, citing *Sahlin v. American Casualty Co. of Reading*, 103 Ariz. 57, 436 P.2d 606 (1968). Defendants have misread *Sahlin*. In that case, we held that the plaintiff had failed to make a case of estoppel against the insurer where the insured could not be considered "excusably ignorant" of the terms of the master policy which were inconsistent with alleged ambiguities contained within the sales brochure. In *Sahlin*, the insured had ample notice of the *unambiguous* provisions of the policy before his death, unlike the present case, in which Calvin Sparks never saw the policy before his accident. Thus, although we believe that plaintiffs in the present case could successfully assert estoppel against defendants under *Sahlin*, we need not rely on this equitable principle in view of our finding that the policy is ambiguous and must be construed against defendants.

2. When Section 23 is read in conjunction with other portions of the policy, it is obvious that a person suffering a disabling injury or illness could never collect the maximum benefits promised *under defendants' interpretation* of the policy. For example, Section 5, subparagraph (3)(B), provides that insurance shall terminate if the insured "ceases to be engaged regularly at least 30 hours weekly." The paragraph further provides that if the cessation of work is due to a disability which prevents the insured from working, the insurance shall remain in effect, but not in excess of a period of six months. Under these circumstances, it is difficult to imagine an injury or illness which would result in medical expenses totaling in

ing provisions clearly sets out the nature of the limitation on coverage. At most, the provisions which defendants rely upon create a doubt regarding the coverage or terms of the contract, and this doubt must be resolved against the insurer. *State Farm Mutual Auto Insurance v. Paynter*, 122 Ariz. 198, 204, 593 P.2d 948, 954 (App. 1979).

■ Defendants respond, however, that medical expense insurance policies are subject to "recognized differences in their interpretation born out of their use and commercial customs." They argue that courts recognize that medical expense insurance provides a right of reimbursement for expenses incurred during the term of the policy, and not otherwise. This argument might be persuasive if the controversy before us were between two insurers. However, we are not concerned with what the "commercial customs" are in the insurance industry, but rather, what the ordinary person's understanding of the policy would be. As noted above, in construing the meaning of an insurance policy, the language used should be viewed from the standpoint of the average layman who is untrained in the law or insurance. *Federal Insurance Co. v. P. A. T. Homes, Inc.*, 113 Ariz. 136, 547 P.2d 1050 (1976); *Thompson v. Government Employees Insurance Co.*, 122 Ariz. 18, 592 P.2d 1284 (App.1979). An ordinary person reading the policy would understand the coverage to operate as it does under a typical automobile or homeowner's policy; *i.e.*, if there is a covered loss on day one, and the insurance policy terminates on day two, the insurance company is obligated to pay the claim to policy limits, irrespective of the termination date of the insurance. Only claims which first arise after termination are not covered. This was the understanding of Suzanne Sparks after she had read defendant's policy. As she stated at trial, "Sure I was aware [of the policy provisions]. When the business closed the insurance would no longer cover it, if we had another accident the next day. But I expected coverage for injuries incurred in the accident while the policy was in force."

excess of a quarter of a million dollars in six

It was not error for the trial court to direct a verdict in favor of plaintiffs on the contract issue.

## BAD FAITH

Defendants also raise the argument that the form of the bad-faith instruction unfairly prejudiced them. Our examination of the instructions reveals that this argument does not really concern the bad-faith instructions, but is more in the nature of a general objection as to the sequence in which the insructions were read to the jury. We deal with this argument first.

■ After instructing the jury that the court had already determined that defendants had breached their insurance contract with the plaintiffs, the trial judge inadvertently read an instruction on tort damages relating to the bad-faith claims, instead of an instruction on contract damages. The court read its instructions to the jury in the presence of counsel who had an opportunity to follow along with their own versions of the instructions. After reading the instructions to the jury, the court specifically asked whether counsel had "corrections or additions" to the instructions as given. Counsel for defendants replied categorically that they had none. Because defendants failed to object to the sequence of the reading of the instructions, they have waived any error on appeal. *Orlando v. Northcutt*, 103 Ariz. 298, 441 P.2d 58 (1968); *City of Scottsdale v. Kokaska*, 17 Ariz.App. 120, 495 P.2d 1327 (1972); 16 A.R.S. Rules of Civil Procedure, rule 51(a).

1. *Correctness of bad-faith instruction under Noble.*

The jury was instructed on bad faith as follows:

Under Arizona law, every insurance contract contains an implied promise of good faith and fair dealing which the insurance company owes to its insured. This promise imposes an obligation on the insurance company to deal fairly in handling a claim made by its insured under

months or less.

the policy and to not unreasonably withhold payment of promised benefits to its insured.

Reasonableness is to be determined on the basis of whether the conduct of the insurer was justified and reasonable under the circumstances found herein.

In *Noble v. National American Life Insurance Co.*, 128 Ariz. 188, 624 P.2d 866 (1981), we recognized that an insurer's bad-faith refusal to pay a valid claim submitted by its insured under a policy of insurance gives rise to a cause of action in tort. In defining the elements of the tort, we quoted with approval from the Wisconsin case of *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978), which focused the inquiry of whether an insurer had acted in bad faith by asking, "would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances." 85 Wis.2d at 692, 271 N.W.2d at 377. We concluded by stating:

"Under the *Anderson* standard an insurance company may still challenge claims which are fairly debatable. The tort of bad faith arises when the insurance company intentionally denies, fails to process or pay a claim *without a reasonable basis for such action.*"

128 Ariz. at 190, 624 P.2d at 868 (emphasis added).

Defendants contend that under *Noble*, the trial court's instruction on bad faith was deficient in three respects: 1) the instruction did not recognize that refusal to pay an insurance claim may be excused if there is justification for the refusal, *i.e.*, that the obligation to pay was "fairly debatable"; 2) the instruction did not define the tort of bad faith as an intentional one; and 3) the instruction did not require proof that the denial to pay was unreasonable as measured by the standard of a "reasonable insurer."

■ We find no error in the instruction given by the trial judge. Although the instruction did not expressly state that an insurer may challenge claims which are fairly debatable, the absence of such a

statement does not render the instruction fatally deficient. The portion of the instruction which measured reasonableness by determining "whether the conduct of the insured was justified and reasonable under the circumstances" is adequate in informing the jury, albeit implicitly, that the insurer may challenge a claim without acting in bad faith.

■ Second, defendants' assertion that the trial court erred by failing to include an intent element in the bad-faith instruction is incorrect. A jury need not be specifically instructed that an intent element is necessary to establish the tort of bad faith. We emphasized in *Noble*, that the inquiry into whether an insurer has acted in bad faith towards its insured is a question of reasonableness under the circumstances of the case. Any action taken by the insurer on a claim submitted by an insured will necessarily be an intentional act. Whether the action amounts to bad faith depends upon whether the insurer failed to honor a claim without a reasonable basis for doing so. These considerations were covered by the trial court's instruction. Further, defendants did not request an instruction which contained any intent element. Instead, they requested an instruction that bad-faith recovery depends upon "so unreasonably ... dealing with another party to the contract that no reasonable person could believe that the conduct was justified by any right provided under the contract." As can be seen, defendants' requested instruction also failed to define the tort of bad faith as an intentional one. The objection raised now is born out of hindsight and cannot be raised for the first time on appeal. 16 A.R.S. Rules of Civil Procedure, rule 51(a); *Hurvitz v. Coburn*, 117 Ariz. 300, 572 P.2d 128 (App.1977).

■ Finally, defendants maintain the jury should have been instructed that in order to find defendants guilty of bad faith, the jury must first find that defendants' denial of coverage was unreasonable under the prevailing standards of the insurance industry. This objection to the trial court's

instruction was not raised below and is therefore waived on appeal. 16 A.R.S. Rules of Civil Procedure, rule 51(a); *Hurvitz v. Coburn, supra.* We also reject defendants' suggestion that the determination of whether an insurer has breached its duty of dealing with its insured in good faith necessitates proof that under prevailing standards of the insurance industry a reasonable insurer would not have denied the claim. The scope of the duty of an insurer cannot be delineated by customs of the insurance industry. *See Silberg v. California Life Insurance Co.,* 11 Cal.3d 452, 113 Cal. Rptr. 711, 717, 521 P.2d 1103, 1109 (1974). What other insurance companies would have done regarding payment of benefits under the circumstances of the present case would be irrelevant in view of the likelihood that each insurance company follows varying practices regarding the payment of doubtful claims. The scope of the duty of the insurer must be measured by the facts and circumstances of each particular case. We find no error in the instruction submitted to the jury.

2. *Sufficiency of evidence in support of bad-faith instruction.*

Defendants argue that the record shows no evidence to support the tort of bad faith measured by the requirements of *Noble.* They maintain that a belief that the insurance contract had terminated for nonpayment of premiums was a privileged act of refusal and that their obligation to pay was "fairly debatable," thus precluding the giving of a bad-faith instruction.

■ It is reversible error to instruct the jury on a legal theory which is not supported by the evidence. *See, e.g., Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411 (1977). It is also reversible error for the trial court to refuse to instruct the jury on a legal theory which is within the issues of the case and is supported by substantial evidence. *Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326 (App.1978). We find that there was substantial evidence presented to support a prima facie case of bad faith.

■ We disagree with the defendants' contention that an insurer's belief that a portion of its insurance contract precludes coverage raises an absolute defense to a claim of bad faith. If the insurer's interpretation of its own contract as excluding coverage could render an insured's claim "fairly debatable," then insurers would be encouraged to write ambiguous insurance contracts, secure in the knowledge that an obscure portion of the policy would provide an absolute defense to a claim of bad faith. Although the insurer's belief that the validity of the insured's claim was fairly debatable is a defense to a charge of bad faith, such a belief is a question of fact to be determined by the jury. *See Corwin Chrysler-Plymouth, Inc. v. Westchester Fire Insurance Co.,* 279 N.W.2d 638, 643–44 (N.D. 1979).

In the present case, substantial evidence was presented entitling plaintiffs to an instruction on bad faith. Defendants were fully aware of the grievous nature of the Sparks' injuries and were further aware that plaintiffs would be faced with staggering medical bills upon termination of benefits. Nonetheless, defendants decided to deny any obligation to pay continuing benefits to plaintiffs based upon patently ambiguous and previously undisclosed provisions in the insurance policy. These facts, in conjunction with the trial court's determination that defendants had breached their contract with plaintiffs, were sufficient to submit the issue of bad faith to the jury.

## JOINT AND SEVERAL LIABILITY OF DEFENDANTS

■ Defendants assert that the trial court erred by submitting the tort theories to the jury on the basis of joint and several liability.

Defendants admitted that ALPHA was a soliciting agent and servicing agent pursuant to an agreement with Republic. Republic underwrote the policy while ALPHA marketed and administered the policy. Pursuant to the agreement, ALPHA issued certificates of coverage, billed and collected

premiums, and handled the investigation and payment of claims. Republic set forth guidelines for ALPHA to follow in deciding whether or not to pay any given claim. Any claims, such as the claims involved here, in excess of $5,000 were referred to Republic. Further, ALPHA prepared the sales brochure which induced Calvin Sparks to enroll in the group insurance program. This brochure was approved by Republic before distribution to prospective insureds. The evidence was uncontroverted that both Republic and ALPHA decided to deny the plaintiffs' claims.

Under these facts, we conclude that the instruction on joint and several liability was proper as to the defendants ALPHA and Republic. There must exist some community of purpose to give rise to joint tort liability. *DeGraff v. Smith*, 62 Ariz. 261, 157 P.2d 342 (1945). Vicarious liability for concerted action may be found to exist when the tort-feasors have entered into a joint enterprise or joint venture. *See* Prosser, *Law of Torts*, 4th Ed. § 46 (1971). A joint venture requires an agreement, a common purpose, a community of interest, and an equal right of control. *West v. Soto*, 85 Ariz. 255, 336 P.2d 153 (1959). Where a joint venture exists, each of the parties is the agent of the others and each is likewise a principal so that the act of one is the act of all. *West v. Soto, supra; Conner v. El Paso Natural Gas Co.*, 123 Ariz. 291, 599 P.2d 247 (App.1979). In such a relationship, it may be said that the partners or persons engaged in the common enterprise are subject to a common duty, the breach of which will subject those persons to liability for the entire harm resulting from the failure to perform the duty. *See* Restatement of Torts (Second) § 878 and comment a.

There can be no doubt that the business relationship entered into by ALPHA and Republic contained all of the essential elements of a joint venture, and that any acts of ALPHA or Republic could be imputed to the other. Both owed a common duty to the insureds: the duty to act in good faith.

The same cannot be said of PST. The evidence established that the only function of the trust was to hold the policy and issue certificates of insurance. Testimony indicated that PST was strictly a mechanism for insurance. Therefore, PST was incapable of exercising any control or taking part in any concerted action toward the plaintiffs. Plaintiffs failed to show any active involvement by PST. The instruction regarding joint and several liability in tort as to PST was improper and the judgment against PST must be reversed.

## MISREPRESENTATION IN VIOLATION OF THE INSURANCE CODE

The jury was instructed that the defendants could be found liable for misrepresentation in violation of the Arizona Insurance Code. The instruction was based upon § 20–443(1), which provides as follows:

> § 20–443. *Misrepresentations and false advertising of policies.*
>
> No person shall make, issue or circulate, or cause to be made, issued or circulated, any estimate, illustration, circular, sales material or statement:
>
> 1. Misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised or the dividends or share of the surplus to be received.

Defendants argue that there is no suggestion within the statute that the legislature intended it to serve as a ground for tort recovery. We disagree.

In *Sellinger v. Freeway Mobile Homes Sales, Inc.*, 110 Ariz. 573, 521 P.2d 1119 (1974), this court unanimously held that the Consumer Fraud Act inferentially created a private cause of action for deceptive sales practices. We stated:

> "Although the Act does not specifically provide for a right of action against persons violating the provisions of the article, we believe inferentially such right of action is granted by § 44–1533. It provides:
>
> > 'The provisions of this article shall not bar any claim against any person who has acquired any monies or property, real or personal, by means of any prac-

tice declared to be unlawful by the provisions of this article.'

Clearly the section quoted contemplates that a person who has been damaged by the practices declared to be unlawful may exert a claim by reason of such acts. It has been held that similar language in a consumer fraud act is sufficient recognition that a cause of action has been created in favor of the consumer. *Rice v. Snarlin, Inc.*, 131 Ill.App.2d 434, 266 N.E.2d 183 (1970)."

*Id.* at 576, 521 P.2d at 1122.

The considerations which lead us to conclude that a private cause of action exists under the Consumer Fraud Act are also present in the context of the Arizona Insurance Code. A.R.S. § 20–443 is found under Chapter 2, Article 6, which deals with unfair practices and frauds in the transaction of the insurance business. Section 20–456 provides that the Director of Insurance, upon a finding that a person has engaged in a prohibited practice under the article, shall issue a cease-and-desist order with regard to the proscribed act or practice and further grants the director authority to impose civil penalties for violation of § 20–443, among others. Subsection C provides:

"No order of the director pursuant to this section or order of court to enforce it, or holding of a hearing, may in any manner relieve or absolve any person affected by the order or hearing from any other liability, penalty or forfeiture under law."

As in *Sellinger*, we believe that this section contemplates a private suit to impose civil liability irrespective of governmental action against the insurer. *See Royal Globe Insurance Co. v. Superior Court*, 23 Cal.3d 880, 153 Cal.Rptr. 842, 592 P.2d 329 (1979); *Greenberg v. Equitable Life Assurance Society*, 34 Cal.App.3d 994, 110 Cal.Rptr. 470 (1973); *Craver v. Union Fidelity Life Insurance Co., supra.*

■ Defendants nevertheless argue that an instruction on misrepresentation was unwarranted because the trial court had ruled that the brochure was the insurance contract for purposes of the vesting of contractual rights. They maintain that the bro-

chure could not misrepresent the terms of the insurance contract because the insurance contract was the brochure. This argument is specious.

Tort liability under § 20–443 was a separate and distinct issue from the contractual issue. The trial court's ruling on the contract issue had nothing to do with the question of whether the brochure actually misrepresented the terms of the policy. Further, no apparent inconsistency was conveyed to the jury since the trial court judge instructed the jury that the defendants had breached their contract with plaintiffs.

■ Finally, defendants assert that a cause of action under the Insurance Code, being a liability created by statute, would be barred by the one-year statute of limitations contained in A.R.S. § 12–541(3). *See Murry v. Western American Mortgage Co.*, 124 Ariz. 387, 604 P.2d 651 (App.1979). Although we agree with this argument, defendants failed to raise this defense prior to judgment and it is therefore waived. *Romo v. Reyes*, 26 Ariz.App. 374, 548 P.2d 1186 (1976).

## AGENCY OF ROBERT BOWDEN

The trial court instructed the jury that Robert Bowden had authority to act on behalf of defendants when he spoke to Calvin Sparks about purchasing the group insurance policy. This authority included showing Mr. Sparks the descriptive brochure, and in describing and explaining the insurance coverage provided by defendants. Defendants argue this instruction was erroneous because Bowden was an insurance broker, and under A.R.S. § 20–300, Bowden had no authority to act on behalf of defendants.

§ 20–300(A) provides:

"A broker, as such, is not an agent or other representative of an insurer and does not have power *by his own acts* to obligate the insurer upon any risk with reference to any insurance transaction." (Emphasis added).

■ Defendants' reliance on this statute is misplaced. Section 20–300 does nothing

more than define the role of a broker vis-à-vis an insurer.[3] The statute is part of a comprehensive legislative scheme designed to regulate the transaction of business in the insurance industry and the licensing of insurance agents, brokers or solicitors for the protection of the public. A.R.S. § 20–290(A). It merely provides that a "broker" may not "by his own acts" obligate the insurer and does not prevent an insurer from bestowing authority on the broker to perform specified acts.

■ Under familiar principles of agency law, the broker may be authorized to do an act by a writing or other conduct of the insurer which, reasonably interpreted, causes the broker to believe that the insurer desires him to act on the insurer's behalf. *See* Restatement (Second) of Agency § 26 (1958). Once the insurer authorizes the broker to conduct a certain transaction, the insurer is liable to third persons upon contracts made by the broker acting within his authority. However, such contracts must be in proper form and with the understanding that the insured is a party. *See* Restatement (Second) of Agency §§ 140, 144 (1958). This is especially true where the insurer has ratified the transaction. *Daru v. Martin*, 89 Ariz. 373, 363 P.2d 61 (1961); *Fuqua Homes, Inc. v. Grosvenor*, 116 Ariz. 424, 569 P.2d 854 (App.1977).

■ The evidence showed that ALPHA and Republic contemplated that independent insurance brokers such as Bowden would solicit customers for their insurance. Defendants supplied Bowden with copies of the sales brochure and applications for the group insurance. Bowden was also required by defendants to certify that he had explained "in detail the coverage to the new member firm." These acts bestowed authority upon Bowden to solicit prospective insureds and to explain the terms of the policy. Even if Bowden had committed an unauthorized act, defendants ratified Bowden's conduct by accepting plaintiffs' application for insurance.

There is also evidence in the record which disputes defendants' claim that Bowden was merely a broker and not an agent of the defendants. Bowden was listed as an agent for Republic in Republic's answer to interrogatories. This response was reaffirmed by Republic's house counsel at trial.

Finally, there is no evidence which indicates that Bowden did anything to exceed the scope of his authority. Plaintiffs presented no evidence that Bowden made any statements contrary to the express terms of the brochure.

■ Defendants respond, nonetheless, that the question of Bowden's agency constituted an issue of fact which should have been decided by the jury. While it is true that the question of whether an agency existed is one of fact, *Corral v. Fidelity Bankers Life Insurance Co.*, 129 Ariz. 323, 630 P.2d 1055 (App.1981), when the material facts from which the agency relationship could be inferred are not in dispute, the question of whether an agency relationship exists is a question of law for the court. *Cote v. A. J. Bayless Markets, Inc.*, 128 Ariz. 438, 626 P.2d 602 (App.1981). We believe that the undisputed facts support the conclusion that Bowden was authorized to act on behalf of the defendants. The instruction on Bowden's agency was proper.

## ATTORNEY'S FEES

After a hearing was conducted on the issue of attorney's fees, the trial court awarded $80,000 to plaintiffs pursuant to A.R.S. § 12–341.01. Defendants contest the award in two respects.

First, defendants argue the award was improper because the tort claims of bad faith and misrepresentation under the Insurance Code dominated the case, and § 12–341.01 allows recovery of attorney's fees only in contract cases. In support, defendants rely heavily on *Amphitheater Public Schools v. Eastman*, 117 Ariz. 559, 574 P.2d 47 (App.1977). Plaintiffs maintain

---

**3.** *See also* A.R.S. § 20–283 (defining "broker" as "an independent contractor"); *Washington Nat'l Ins. Co. v. Employment Security Comm'n*, 61 Ariz. 112, 144 P.2d 688 (1944) ("broker" is one who acts as a middleman between the assured and the insurer.)

that the tort claims were actions "arising out of a contract" and therefore, the statute applies.[4]

The language employed in subsection (A) makes clear that attorney's fees are recoverable only in cases "arising out of a contract." The language is broad enough, however, that it could be argued, as plaintiffs do here, that attorney's fees may be recoverable in tort cases which find their basis in contract. Such an argument was rejected in *Amphitheater, supra.* In that case, the plaintiff had left her car with an instructor in an auto mechanics program conducted by the defendant school for an assessment of needed repairs. The instructor asked a student to notify the plaintiff's son that he should pick up his mother's car that day. The instructor stated in front of fifteen other students that he would leave the keys in the ignition. The car was later stolen. Plaintiff, the successful party, sought attorney's fees under § 12–341.01 on the theory that her claim arose out of a contract of bailment. The Court of Appeals, Division Two, responded to this argument by stating:

> "Her complaint contains one count in negligence and another alleging breach of the bailment contract in the negligent failure to care for her car. Regardless of the label on the second count, the essence of her claim is negligence, and the statute has no application."

*Id.* at 560, 574 P.2d at 48.

The continued validity of this holding was cast in serious doubt by our decision in *Wenk v. Horizon Moving & Storage Co.*, 131 Ariz. 131, 639 P.2d 321 (1982). In *Wenk*, plaintiffs brought an action against a moving and storage company to recover the value of some lost items of furniture. Plaintiffs alleged both a breach of a bailment contract and negligence in the loss of their property. The trial court awarded damages in favor of plaintiffs based upon conclusions of law that there was 1) a common-law bailment and 2) the moving company had failed to exercise ordinary and reasonable care in handling the items. Plaintiffs' request for attorney's fees pursuant to § 12–341.01 was denied and plaintiffs appealed the denial of attorney's fees. In effect, we held that attorney's fees could be awarded based upon the common-law bailment.

■ It is apparent from the *Wenk* case that attorney's fees may be awarded pursuant to § 12–341.01(A) based upon facts which show a breach of contract, the breach of which may also constitute a tort. The fact that the two legal theories are intertwined does not preclude recovery of attorney's fees under § 12–341.01(A) as long as the cause of action in tort could not exist *but for* the breach of the contract.

■ With this in mind, we turn to the question of whether the torts of insurer's bad faith and misrepresentation under § 20–443 are actions "arising out of a contract."

In *Noble v. National American Life Insurance Co., supra*, we stated that "it is reasonable to conclude that *there is a legal duty implied in an insurance contract* that

---

4. § 12–341.01. Recovery of attorney's fees

A. In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees. This section shall in no manner be construed as altering, prohibiting or restricting present or future contracts or statutes that may provide for attorney's fees.

B. The award of reasonable attorney's fees awarded pursuant to subsection A should be made to mitigate the burden of the expense of litigation to establish a just claim or a just defense. It need not equal or relate to the attorney's fees actually paid or contracted, but such award may not exceed the amount paid or agreed to be paid.

C. Reasonable attorney's fees shall be awarded by the court in any contested action upon clear and convincing evidence that the claim or defense constitutes harassment, is groundless and not made in good faith. In making such award, the court may consider such evidence as it deems appropriate and shall receive this evidence during trial on the merits of the cause, or separately, regarding the amount of such fees as it deems in the best interest of the litigating parties.

D. Reasonable attorney's fees awarded under the provisions of this section shall be awarded by the court and not by a jury.

the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort." 128 Ariz. at 190, 624 P.2d at 868 (emphasis added). Clearly, the tort of bad faith cannot be committed absent the existence of an insurance contract and a breach thereof. Because the existence of the tort is so intrinsically related to the contract, we conclude that an action alleging insurer's bad faith is one "arising out of a contract" within the meaning of § 12–341.01(A).[5]

The same cannot be said for an action for misrepresentation under § 20–443. Such an action sounds mainly in tort and its existence does not depend upon a breach of the contract of insurance. In most cases, an action under § 20–443 would arise after the insured discovered that the contract he entered was not as represented in the sales material. The insured may be bound by the contract if he had notice of its terms before a claim was submitted, cf. Sahlin v. American Casualty Co. of Reading, supra, but a cause of action available under § 20–443 may nevertheless provide the insured with a remedy. The tort committed by the insurer in this situation would not involve a breach of the actual contract; therefore, it would not be an action arising from a contract.

■ Although we hold that attorney's fees are not recoverable under § 12–341.-01(A) for misrepresentation under the Insurance Code, this does not require us to reduce or vacate the award in the instant case.

During the hearing on the issue of attorney's fees, plaintiffs introduced testimony from respected members of the bar, including a former judge of the Court of Appeals, setting an estimate of reasonable attorney's fees in this case in the range of $62,000 to $225,000. One witness testified that in arriving at his own estimate, he ignored the punitive award because he felt the "initial verdict would have flown from the contract under whatever theory was vouched." Although admitting that it was difficult to

separate the contractual aspects from the verdict, the witness concluded, "I felt certainly that the case arose from the breach of contract, and I think in fairness to everybody concerned that those figures [$175,000 to $225,000] are, in my opinion, justified by the case." In view of the testimony which estimated reasonable attorney's fees in amounts substantially higher than those actually awarded, we believe the $80,000 award was proper and was within the court's discretion.

Second, defendants protest an order of the trial court which prevented them from examining the fee agreement between plaintiffs and their counsel. Defendants argue that they are entitled to discovery of the fee contract in order to determine the statutory limitation for an award of attorney's fees under § 12–341.01(B), and that the refusal to permit discovery was violative of due process.

■ Subsection (B) provides that the award "need not equal or relate to the attorney's fees actually paid or contracted, but such an award may not exceed the amount paid or agreed to be paid." Defendants are correct in their assertion that subsection (B) sets a limit on the amount the court may award pursuant to § 12–341.01(A); however, we disagree with defendants' argument that they are entitled to examine the fee contract. The trial court examined the fee agreement in camera before making its award, thus assuring itself that the final award did not exceed the amount agreed to be paid.

■ Due process requires that a party be given notice and an opportunity to be heard and, to give substance to the hearing, the court must consider and appraise the evidence which justifies its determination. State v. Essman, 98 Ariz. 228, 403 P.2d 540 (1965). A full hearing was conducted on the issue of attorney's fees. Defendants were afforded an opportunity to cross-examine plaintiffs' witnesses and to present

---

5. It is also conceivable that attorney's fees may be awarded pursuant to subsection (C) in a bad-faith action.

their own evidence in rebuttal. The trial judge, having examined the fee agreement, was able to make an award based upon the evidence and with the limitation of § 12–341.01(B) in mind. The hearing and the judge's personal inspection of the fee agreement adequately safeguarded defendants' due-process rights.

█ Defendants raise a final, and somewhat novel, argument. They submit that attorney's fees may not be awarded under § 12–341.01(B) when the contract between the party and the attorney is a contingency-fee agreement. They reason that under such an agreement, the client is not obligated to pay the attorney anything, but only shares with counsel such recovery as may be obtained.

We cannot agree that a contingency-fee agreement does not obligate a party "to pay attorney's fees from his own pocket," as defendants suggest. After obtaining a judgment, a client who has retained counsel on a contingency basis must surrender the agreed upon percentage of the judgment as remuneration. This is certainly an "expense of litigation" under subsection (B). The award of attorney's fees mitigates the burden of the expense of litigation by offsetting the amount due the attorney. Therefore, we hold that subsection (B) allows an award of attorney's fees when a contingency-fee agreement is involved.

The judgment of the Superior Court is affirmed as to defendants ALPHA and Republic. The judgment is reversed as to defendant PST and remanded for proceedings consistent with this opinion.

GORDON, V. C. J., and CAMERON, J., concur.

HOLOHAN, Chief Justice, concurring:

I concur in the result.

FELDMAN, Justice, specially concurring:

I concur with the result and agree with the thorough exposition contained in the majority opinion. I write only to state my belief that under the facts of this case it is not necessary to examine the actual policy in order to conclude that there is coverage for post-termination expenses incurred as the result of a pre-termination injury.

As the majority opinion indicates, the brochure failed to inform the insured that expenses for a pre-termination injury would not be paid after termination. Such an explanation might have conveyed to the insured the alarming idea that if he sustained a permanently and completely disabling injury which prevented him from continuing to keep the policy in force, the insurer could not only terminate the policy but could also terminate its existing obligation to pay continuing medical expenses for injuries which had occurred while the policy was in force. Without such an explicit statement, the ordinary consumer reading the brochure would have a reasonable expectation that when a covered injury occurred while the policy was in full force, the company would be bound to continue to pay benefits up to the policy limits.

Thus, while I agree that there is an ambiguity when the policy is compared to the brochure, I think we need not even reach that question. Because the insurer advertised and sold the coverage through the brochure, and provided the insured with no other information, I would simply hold that the insurer is bound by the writing which contains all the coverage agreements given its insured. The insurer cannot defeat coverage by raising unusual exclusions or termination rights not contained in the information given the insured. It cannot rely upon the provisions of a master policy never shown the insured—and from a practical standpoint not even available to him—in order to subtract from the coverage reasonably to be expected by the insured after reading the sales material and information which was given him. *See Preferred Risk Mutual Insurance Co. v. Thomas*, 372 F.2d 227, 230–31 (4th Cir. 1967); *Lecker v. General American Life Insurance Co.*, 55 Hawaii, 624, 525 P.2d 1114 (1974); *Lewis v. Continental Life & Accident Co.*, 93 Idaho 348, 461 P.2d 243 (1969); *Van Vactor v. Blue Cross Ass'n.*, 50 Ill.App.3d 709, 8 Ill. Dec. 400, 365 N.E.2d 638 (1977).

An insurer which has led its insured to believe that a risk is covered cannot be permitted to use an undelivered contract to prove the contrary. *Preferred Risk Mutual Insurance Co., supra.* Significant policy exclusions contained in an undistributed master contract but omitted from the brochure distributed to policyholders cannot be enforced. *Van Vactor v. Blue Cross, supra.*

Of course, my conclusion that the company is bound by the coverage reasonably to be inferred from its sales material does not in any way detract from the holdings reached in the majority opinion and, in fact, would make all the conclusions which flow from a finding of post-termination coverage, including the holding on "bad faith", even more compelling.

## MOTIONS FOR REHEARING DENIED

HAYS, Justice.

The jury instructions in this case were given before this court's decision in *Noble v. National American Life Insurance Co.*, 128 Ariz. 188, 624 P.2d 866 (1981). In the case at issue, the challenged instructions on the tort of bad faith were held not to constitute reversible error. We, however, do not approve the use of those instructions in future cases. Our case of *Noble* sets out the principles which should be embodied in instructions on cases involving the tort of bad faith.

The motions for rehearing are denied.

HOLOHAN, C. J., GORDON, V. C. J., and CAMERON and FELDMAN, JJ., concur.