719 P.2d 693

**COCONINO COUNTY, a body politic, Lola M. Shorty, A married woman, and Grady Graham, a single man, Third Party Plaintiffs-Appellees,**

v.

**FUND ADMINISTRATORS ASSOCIA- TION, INC., a Kansas corporation, Fund Administrators, Inc., a Kansas corporation; Doug Ruedlinger, Inc., a Kansas corporation; Fund Insurance Company, Ltd., of Hamilton, Bermuda, a corporation; Arizona Interscholastic Association, Inc., an Arizona associa- tion, Third Party Defendants-Appel- lants.**

No. 1 CA–CIV 7684.

Court of Appeals of Arizona,
Division 1, Department C.

May 8, 1986.

John Verkamp, Coconino Co. Atty. by Michael G. Prost, Deputy Co. Atty., Flagstaff, for third party plaintiffs-appellees.

Aspey, Watkins & Diesel by Louis M. Diesel and Donald H. Bayles, Jr., Flagstaff, for third party defendants-appellants.

## OPINION

CORCORAN, Judge.

On December 16, 1981, Micole Shorty, a Flagstaff High School Senior, was severely and permanently injured while participating in an official interscholastic wrestling meet between Flagstaff High School and Winslow High School. The meet was held under the sanction and authority of the Arizona Interscholastic Association (AIA). Micole was treated at the Flagstaff Hospital and Medical Center (Flagstaff Hospital) from the time of his injury until his release on February 22, 1982. His hospital bill was over $41,000 at the time of his release. It is undisputed that his total hospital bill was incurred as a direct result of the December 16 accident. As a result of his injury, Micole will require continuing medical care and physical therapy.

Prior to and during the period of his hospitalization, Micole was categorically eligible for county medical assistance as administered by Coconino County, a body politic, pursuant to then A.R.S. §§ 11–291, *et seq.*[1] This series of statutes provided Coconino County with the authority to establish regulations that would "provide for the hospitalization and medical care of the indigent sick in the county." Micole was a registered, card-carrying recipient of the Coconino County Medical Assistance Program. He had qualified for the program based upon a prior determination by the Arizona Department of Economic Security (DES) that he was eligible for benefits from Aid to Families with Dependent Children (AFDC). DES regulations and the applicable Coconino County regulations provide that all public welfare recipients are indigent and therefore eligible for county medical assistance "unless medical care is available from another source."

The AIA is a private, non-profit Arizona corporation and the sole official sanctioning body for interscholastic athletics among Arizona high schools. Membership is voluntary; however, most public high schools in Arizona, including Flagstaff High School, belong to the AIA.

On May 1, 1981, the AIA purchased a group accident medical insurance policy, known as "The 'Partners in Protection' Program," which included catastrophic injury coverage. The policy was sold by Doug Ruedlinger, a licensed non-resident insurance agent in the State of Arizona, through an insurance purchasing group called Fund Administrators Association, Inc. (Fund), previously known as Fund Ad-

---

1. At the time of Micole's accident, Arizona was the only state in the nation which did not have Medicaid or any state equivalent thereof. Instead, each county had its own program providing medical benefits for indigent residents.

Since Micole's accident, our Legislature has amended A.R.S. § 11–291 to include reference to title 36, chapter 29, the Arizona Health Care Cost Containment System (AHCCCS). A.R.S. §§ 36–2901 *et seq.*, provides the director of the AHCCCS administration with the authority to apply for and accept *federal* funds for the implementation of the AHCCCS.

One of Coconino County's main arguments in this appeal, i.e., that a public medical assistance program is always the "payor of last resort" in situations like the instant case, has been codified in A.R.S. § 36–2903(G). We note that this change in statutory law has no effect on our resolution of the instant case which arose before the effective date of this section. Laws 1985, ch. 316, § 10.

ministrators, Inc. The program was administered by Doug Ruedlinger, Inc., and underwritten by Fund Insurance Company, Ltd. Ruedlinger and his wife own and/or control all of these corporations because of their stock holdings. The policy was in effect at the time of Shorty's injury and his hospitalization. The catastrophic medical/dental reimbursement provisions provided for a maximum recovery of $100,000 with a $10,000 deductible.

On December 29, 1981, Grady Graham (Micole's grandfather and legal guardian) signed the hospital's standard admission agreement, on behalf of his grandson, assigning to the hospital the right of reimbursement from any applicable insurance policy. One clause in the agreement provides that Graham and Micole agree to guarantee payment of the hospital bill.

On March 1, 1982, Fund denied a claim filed by Graham on behalf of Micole for medical reimbursement under the AIA policy. Fund stated in its letter to Graham:

> In considering your claim we took into account the letter ... from the Coconino County Department of Medical Assistance, this letter indicates that all billable services indicated on the Flagstaff Hospital and Medical Center's statement are payable at County expense and that you have, therefore, incurred no expenses reimbursable by the policy carried by the Arizona Interscholastic Association.

Shortly thereafter, Coconino County made a formal demand upon Fund for payment of Micole's outstanding hospital charges, and on May 25, 1982, Fund sent a letter to Coconino County denying its demand for payment. In its letter, Fund wrote:

> Grady Graham and Micole Shorty are not entitled to collect benefits under the policy issued to Fund Administrators Association and Arizona Interscholastic Association because they have actually incurred no expenses for his hospital bills.
>
> ....
>
> It seems to us that the county entered into a contract with Micole Shorty and Grady Graham ... at the time they began paying AFDC ... and that contract

was in effect at the time he was injured.... It is the intent of the [Fund] policy of insurance ... covering participants in A.I.A. activities that such contracts of primary medical coverage ... be primarily responsible for accident medical benefits.

The Flagstaff Hospital filed suit against Coconino County for payment of the hospital bill. Coconino County filed its answer and a third-party complaint against Fund. Micole, Lola Shorty (his mother), and Graham joined as co-plaintiffs with Coconino County in its third-party complaint. The third-party complaint was amended and Micole Shorty was dropped as a party to the suit. Flagstaff Hospital amended its complaint and sued Fund directly in a separate count. Fund, in its opening brief on appeal, states that this complaint was "dismissed" pursuant to an agreement that the non-successful party (i.e., Coconino County or Fund) would assume responsibility for the hospital bills. Coconino County, in its answering brief, takes issue with this statement, and correctly points out that if Fund entered into a separate stipulation with Flagstaff Hospital, it was not filed with the trial court. The judgment of the trial court which is the subject of this appeal includes an order that Flagstaff Hospital's original complaint against Coconino County "is hereby dismissed with prejudice."

Fund and Coconino County filed cross-motions for summary judgment. The court by minute entry denied Fund's motion and granted Coconino County's. Fund filed a motion for new trial and objections to the form of judgment submitted by Coconino County.

The trial court entered its formal written judgment which granted Coconino County's motion for summary judgment, denied Fund's motion for summary judgment, denied Fund's motion for new trial, and overruled Fund's objections to the form of judgment. Thereafter, Fund filed a timely notice of appeal.

The primary question is: which party, Fund or Coconino County, is liable for the payment of Micole's hospital bills? Fund

claims that it is not liable under its policy which states that it pays for expenses actually incurred in excess of other collectible benefits. Fund maintains that Micole was receiving county assistance at the time of his accident, and therefore, he had other collectible benefits. Furthermore, Fund argues that Micole never actually incurred expenses. Coconino County's position is that Micole was no longer eligible for county assistance once he had medical care available from another source (i.e., the Fund policy) because this negated his indigency status. Therefore, the Fund is responsible for Micole's bills once the policy deductible amount has been exceeded.

1. *Actually Incurred Expenses*

■ There is no dispute that Micole was a covered person injured during participation in a covered activity as defined in the Fund policy. In Section III ("Catastrophe Medical Protection") of the Fund policy, reimbursement can be obtained only for "expenses actually incurred" by the covered person. Fund claims that Micole never actually incurred expense since his treatment costs were properly the responsibility of Coconino County. Fund argues in support of its position that Flagstaff Hospital sent the bills for Micole's treatment to Coconino County and never requested payment of any kind from Micole, himself. Fund also points out that the hospital brought suit against Coconino County, not Micole. Fund recognizes that Edward Bermingham, the assistant business office manager at Flagstaff Hospital, stated in an affidavit that "Flagstaff Hospital holds Micole Shorty ultimately responsible for said unpaid hospital bill, since Micole Shorty is the patient who incurred those medical expenses for treatment by Flagstaff Hospital." However, Fund is quick to call our attention to the affidavit of James H. Lundy, counsel for Flagstaff Hospital, in which he states: "While the hospital would technically proceed against a county medical patient if costs were not eventually paid, this remains only an abstract possibility."

"Incur" is generally accepted to mean "to become liable for", not "to pay for."

*Collins v. Farmers Ins. Exch.*, 271 Minn. 239, 244, 135 N.W.2d 503, 507 (1965); *see American Indem. Co. v. Olesijuk*, 353 S.W.2d 71, 72 (Tex.Civ.App.1961). Fund cites a number of cases, including *United States v. St. Paul Mercury Indem. Co.*, 238 F.2d 594 (8th Cir.1956); *Lefebvre v. Government Employees Ins. Co.*, 110 N.H. 23, 259 A.2d 133 (1969); and *Research Medical Center v. Safir*, 616 S.W.2d 553 (Mo.App.1981), as support for the proposition that Micole did not *actually* incur expense. We have reviewed these cases and find them to be neither persuasive nor applicable to the instant case. Micole was hospitalized in a private institution. The hospital admission form was signed by Micole's legal guardian on his behalf and expressly provided that Micole and his guardian were the ultimate guarantors of the treatment costs. Whether the possibility was remote or not, the private hospital could have proceeded against Micole, the guarantor, and sought payment. In this regard, the deposition of Mr. Bermingham is instructive:

Q. Will you, sir, on behalf of the hospital, say that Micole Shorty will never be called upon to pay any part of the hospital bill?

A. No.

Q. Will you, on behalf of the hospital, say that Micole Shorty need not be concerned about ever having to pay any part of the hospital bill?

A. No.

Q. Will you, on behalf of the hospital, say that Micole Shorty's name can be removed from the hospital bill?

A. No.

Q. Will you agree to release Micole Shorty from any liability on the hospital bill?

A. No.

Given the record before us, we hold that Micole did actually incur expenses during his hospitalization. *See Olesijuk*, 353 S.W.2d at 72, in which a Texas appellate court concluded:

Inasmuch as [the insured] contracted for these [medical] services with *private* persons and institutions and became *liable* for the payment of the charges therefor, such charges were *incurred* by him and [his insurance company] became liable to him for such expenses so incurred.

(Emphasis added.)

### 2. *Other Collectible Benefits*

The next issue is whether Micole's county medical assistance constituted "other collectible benefits" within the meaning of the Fund policy. The Fund policy authorizes reimbursement for medical expenses incurred "in excess of other collectible benefits." Fund contends that this language clearly reveals that it is "excess insurance," and therefore, its obligation to pay does not arise until the insured's primary coverage is exhausted. Fund points out that it is this "excess" character which allows it to offer affordable premiums to its insureds. Fund argues that the county medical assistance which Micole was receiving at the time of his injury constitutes "other collectible benefits" (i.e., primary coverage), and that the Fund's "excess" policy was not applicable since county medical assistance was, for all practical purposes, unlimited. In response, Coconino County states that Micole's status as an "indigent" (a prerequisite for county medical assistance), terminated once his medical care was "available from another source" pursuant to DES Regulation R6–3–1213 and the applicable Coconino County Department of Medical Assistance regulation. Coconino County maintains that after it paid the $10,000 Fund policy deductible, the coverage provided by Fund was another available source, and therefore, Micole was no longer eligible for county medical assistance. This battle involves a covered insurance claim where the insurer attempts to thrust another party (Coconino County and its taxpayers) in front of it before running on the sword of financial liability. *See* W. Shakespeare, *Julius Caesar*, V, v; 1 *Chronicles* 10:4.

██ Fund argues that its policy language, "other collectible benefits": (1) is unambiguous and (2) includes Micole's medical assistance. Coconino County disagrees on both counts. It is a well-settled principle of law that where there is doubt or ambiguity regarding insurance contract coverage or its terms, we construe against the insurer and in favor of the insured. *Ranger Ins. Co. v. Lamppa*, 115 Ariz. 124, 125–26, 563 P.2d 923, 924–95 (App.1977). If an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation. *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 535, 647 P.2d 1127, 1133 (1982). Where the language employed is unclear and can be reasonably construed in more than one sense, an ambiguity exists in a policy, and the language should be examined from the viewpoint of one not trained in law or in the insurance business. *State Farm Mut. Auto. Ins. Co. v. Gibbs*, 139 Ariz. 274, 279, 678 P.2d 459, 464 (App. 1983). This rule applies with even greater force where the ambiguity appears in an exclusionary clause. *Id.*

██ Section III(B)(1) of the Fund policy ("Catastrophe Medical Protection: Coverage") provides that Fund will "pay the expenses actually incurred by the Covered Person—in excess of other collectible benefits...." The term "other collectible benefits" can also be found on the cover sheet page of Section III, but it is not defined in the Fund policy. However, Section III(E)(2) ("Catastrophe Medical Protection: Limitations") provides that Fund "shall not be obligated to ... pay medical expenses for which there is other collectible *insurance* available." (Emphasis added.) Both of these subsections are found on the same page in the Fund policy. We believe that it would be reasonable for an insured to read these two subsections *in pari materia*, and conclude that "other collectible benefits" is limited and defined by "other collectible insurance." Although an individual clause of an insurance policy, standing alone, might be determined to have no ambiguity, the policy must be read as a whole

in order to give a reasonable and harmonious meaning and effect to all its provisions. *Sparks*, 132 Ariz. at 536, 647 P.2d at 1134. The average layman would expect to find specific limitations on his insurance coverage enumerated in a section entitled, "Limitations." Also, the phrases, "other collectible benefits" and "other collectible insurance," are so similar that the average layman would consider them to be one and the same. In light of this, and our policy that clauses limiting insurance benefits are strictly construed in favor of the insured, *Beaugureau v. Equitable Life Assur. Soc'y*, 132 Ariz. 596, 598, 647 P.2d 1194, 1196 (App.1982), we conclude that the Fund policy authorizes reimbursement for all medical expenses for which there is no other collectible *insurance* available.

■ The essence of insurance, as that term is commonly understood, is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies. A.R.S. § 20–103; *Wojtkowski v. Hartford Acc. & Indem. Co.*, 27 Ariz.App. 497, 498, 556 P.2d 798, 799 (1976). *See also* 1 *Couch on Insurance 2d* § 1:2 (rev. ed. 1984); *Webster's Third New International Dictionary* 1173 (1981); *Black's Law Dictionary* 721 (5th ed. 1979). The medical assistance provided by Coconino County to Micole does not fit this definition; it is more akin to an award of welfare benefits rather than a contractual undertaking. *See Wojtkowski, supra.* We, therefore, hold that there was no other collectible *insurance* available to Micole at the time of his accident and during his hospitalization. Consequently, Fund is responsible for the payment of Micole's hospital bills up to their policy recovery ceiling of $100,000.

### 3. *Public Policy*

■ Our holding is further supported by the public policy announced by the Washington Supreme Court in *Witherspoon v. St. Paul Fire & Marine Ins. Co.*, 86 Wash.2d 641, 548 P.2d 302 (1976). *Witherspoon* involved a liability battle between a private insurance company and a governmental welfare program. *Cf. State Farm Mut. Auto. Ins. Co. v. Bogart*, 717 P.2d 449 (Ariz.1986) (involving a liability battle between two insurance companies). The court concluded that "public policy considerations reinforce the need for specific mention of Medicare in the exclusionary clause if the insurer intended all Medicare expenses to be excluded." 86 Wash.2d at 652, 548 P.2d at 309. The court went on to state:

> In the case of Medicare, considering its overwhelming importance to the population of the country, including its working and retired population, it is especially important that exclusionary language be written in such clear fashion that the average man will know the extent of the insurance coverage he is purchasing.

*Id.* at 653, 548 P.2d at 309. We agree that these types of exclusions must be made expressly or they are not made at all. Governmental welfare programs cannot be excluded by general language; the private insurer must be specific. Public policy mandates this conclusion.

We have examined the Fund policy in light of general principles of insurance contract interpretation, and we hold that the policy's exclusionary language does not allow it to escape liability for Micole's treatment costs.

For the foregoing reasons, the judgment of the trial court is affirmed.

KLEINSCHMIDT, P.J., and EUBANK, J., concur.