MASTROM, INC. AND THE MUTUAL FIRE, MARINE & INLAND INSURANCE COMPANY v. CONTINENTAL CASUALTY COMPANY

No. 8526SC330

(Filed 17 December 1985)

**Insurance § 150— professional accounting services covered—no coverage for fraudulent investment activities**

Damages caused by fraudulent investment activities of plaintiff insured were not covered under an accountant's professional liability policy as damages "arising out of the performance of professional services for others in the insured's capacity as an accountant or notary public."

APPEAL by plaintiffs from *Snepp, Judge.* Judgment entered 30 October 1984 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 18 October 1985.

Plaintiffs appeal from an order dismissing their action against defendant insurer on an accountants' professional liability policy.

*Craighill, Rendleman, Ingle & Blythe, by James B. Craighill, for plaintiff-appellants.*

*Golding, Crews, Meekins, Gordon & Gray, by Harvey L. Cosper, Jr. and Ned A. Stiles, for defendant-appellees.*

EAGLES, Judge.

The dispositive question on appeal is whether damages caused by fraudulent investment activities of Mastrom, the insured, were covered under an accountant's professional liability policy as damages "arising out of the performance of professional services for others in the insured's capacity as an accountant or notary public." We conclude that this policy language does not cover the conduct alleged, and affirm the judgment dismissing the action.

I

Mastrom, Inc. did business providing a range of accounting, tax, and financial management services, primarily to doctors and dentists. Mastrom also provided similar services to Thermal Belt Air Service (TBAS), to which several of Mastrom's corporate directors had close ties. Those same directors induced Mastrom clients to invest in unsecured notes of TBAS. Beginning in 1978,

lawsuits were brought by seven of these clients, alleging that Mastrom's directors fraudulently concealed the true financial condition of TBAS, which has since become bankrupt. Mastrom made demand on defendant insurer Continental Casualty to defend it in these actions, relying on its "Accountants Professional Liability" policy, and defendant refused. Plaintiff Mutual Fire, which provided Mastrom with excess liability insurance, then took over the defense of Mastrom in that litigation and eventually reached settlements with the complaining investors. Mastrom and Mutual then brought this action.

Defendant relied on the following policy language in obtaining dismissal in the trial court:

[Defendant] . . . agrees with the insured . . . as follows:

I. COVERAGE

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any act or omission of the insured, any predecessor in business of the Named Insured or any other person for whose acts or omissions the insured is legally responsible, and arising out of the performance of professional services for others in the insured's capacity as an accountant or notary public and the company shall have the right and duty to defend any suit against the insured seeking such damages.
. . .

II

The duty of an insurer to defend its insured is based on the coverage contracted for in the insurance policy. *See Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.,* 277 N.C. 216, 176 S.E. 2d 751 (1970). Provisions of insurance policies are generally to be construed in favor of coverage and against the insurer. *Maddox v. Colonial Life & Accident Ins. Co.,* 303 N.C. 648, 280 S.E. 2d 907 (1981). This principle applies, however, only when the terms of the policy are ambiguous. *First Nat'l Bank v. Nationwide Ins. Co.,* 303 N.C. 203, 278 S.E. 2d 507 (1981). As applied to the present facts, the policy language is not ambiguous in excluding coverage for the conduct at issue. We reach this result even under the liberal treatment we give to plaintiffs' allegations, *i.e.,* that the allegations of their complaint must be treated as true on appeal of a

judgment of dismissal under G.S. 1A-1, R. Civ. P. 12(b)(6). *See Lupo v. Powell*, 44 N.C. App. 35, 259 S.E. 2d 777 (1979).

## III

The crux of this appeal involves what type of professional services defendant agreed to insure by the policy language, "arising out of professional services for others in the insured's capacity as an accountant." The insurance policy clearly is not a general liability policy. Although Mastrom offered a wide range of services, defendant agreed only to assume liability for damages arising out of the firm's accounting services.

An accountant is a "[p]erson skilled in keeping books or accounts; in designing and controlling systems of account; in giving tax advice and preparing tax returns." Black's Law Dictionary 18 (5th ed. 1979). Our statutes define all the various classes of accountants as persons who engage in the "public practice of accountancy." G.S. 93-1(a)(1), (3), (4). They define that practice in G.S. 93-1(a)(5):

> A person is engaged in the "public practice of accountancy" who holds himself out to the public as a certified public accountant or an accountant and in consideration of compensation received or to be received offers to perform or does perform, for other persons, services which involve the auditing or verification of financial transactions, books, accounts, or records, or the preparation, verification or certification of financial, accounting and related statements intended for publication őr renders professional services or assistance in or about any and all matters of principle or detail relating to accounting procedure and systems, or the recording, presentation or certification and the interpretation of such service through statements and reports.

*See also* 1 C.J.S. Accountant (1936); 1 Am. Jur. 2d Accountants Section 1 (1962). Accounting is a skilled profession embracing the matters described in G.S. 93-1(a)(5), *supra. See Duggins v. N.C. State Bd. of Certified Public Accountant Examiners*, 294 N.C. 120, 240 S.E. 2d 406 (1978); 1 Am. Jur. 2d, Accountants, Section 2 (1962). Nowhere do we find any definition of "accountant" broad enough to include the sale of securities, nor any definition of "accountant" as one who offers a general range of financial services.

We note that the sale of securities is regulated by statute elsewhere. G.S. 78A-1 *et seq.*; 15 U.S.C. Section 77a *et seq.*

We are aware that certain "gray areas" exist, particularly with respect to tax law, where the professional services of accountants can become difficult to distinguish from other professional services. *See Bancroft v. Indemnity Ins. Co.*, 203 F. Supp. 49 (W.D. La.) (accountant advising client on tax consequences of sale), *aff'd*, 309 F. 2d 959 (5th Cir. 1962). Nothing about the instant transactions, which involve the promotion and sale of TBAS securities as a profit-making venture unrelated to taxes, brings these transactions into any of the "gray areas." By the clear language of the policy, then, defendant could and did properly refuse to defend these actions.

IV

Plaintiffs attempt to avoid this result by directing our attention to the language "arising out of." They cite *Fidelity & Casualty Co. v. N.C. Farm Bureau Mut. Ins. Co.*, 16 N.C. App. 194, 192 S.E. 2d 113, *cert. denied*, 282 N.C. 425, 192 S.E. 2d 840 (1972). There we held that the words "arising out of" are words of much broader significance than "caused by," but mean "originating from," "incident to," or "having connection with." Since Mastrom acquired information about the investors' financial condition in the course of its professional accounting services and used that information to identify the investors as potential buyers of TBAS securities, plaintiffs argue that the sales "arose out of" the accounting services and therefore were covered under the policy. We disagree.

In *Fidelity & Casualty v. Farm Bureau*, we were interpreting an automobile liability policy in light of the established purpose of our mandatory financial responsibility laws to provide broad protection for the public and the substantial case law from other jurisdictions reaching a similar result (that persons loading truck were "using" truck). Those considerations do not apply here. More importantly, the policy here is to be construed as a whole, having reference to the purposes of the entire contract. *Blake v. St. Paul Fire & Marine Ins. Co.*, 38 N.C. App. 555, 248 S.E. 2d 388 (1978). The policy provisions must be interpreted reasonably consistent with their plain intent. *Huffman v. Occidental Life Ins. Co.*, 264 N.C. 335, 141 S.E. 2d 496 (1965). We find nothing in this

policy, an accountant's professional liability policy and not a general liability policy, that reasonably suggests an agreement to cover other activities which might arise out of the mere acquisition of information about clients by accountants. Under the construction urged by plaintiffs, defendant could be required to provide general liability coverage for virtually any client claim as long as the client's first contacts with Mastrom were services. That result would be absurd and untenable. The policy clearly requires a real causal connection between the accounting services rendered and the damages.

## V

Defendant relies on, and plaintiffs seek to distinguish, the case of *Smith v. Travelers Indem. Co.*, 343 F. Supp. 605 (M.D.N.C. 1972). There the court rendered summary judgment for the professional malpractice insurer, which claimed that its insured attorney's investment activities did not "arise out of" his professional capacity. The insured attorney, licensed in Virginia, sought out the plaintiff in North Carolina. The attorney suggested that he be allowed to invest plaintiff's money. The attorney never advised plaintiff on legal matters. Plaintiff simply felt that an attorney ought to know more about investment matters than other people. The court found this transaction outside the scope of the attorney's professional activities.

With respect to the transactions here, Mastrom independently promoted the sale of TBAS securities. No client asked Mastrom to investigate the purchase of TBAS, but instead Mastrom initiated the complained-of transactions for its own business purposes. No connection, other than the mere collection of information, existed between any professional accounting services rendered by Mastrom and the sale of TBAS securities. *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 209 S.E. 2d 795 (1974), cited by plaintiffs as controlling over *Smith*, involved questions of principal and agent and a long-term course of conduct approved by the principal. Accordingly it is not controlling as to the insurer-insured relationship here.

## CONCLUSION

The policy language unambiguously excluded coverage for Mastrom's sale of TBAS securities. The court accordingly ruled

correctly in dismissing the complaint for failure to state a cause of action. Because we reach this result, we need not reach the questions (1) of the applicability of the policy language excluding coverage for fraudulent acts or (2) of the period of coverage.

Affirmed.

Judges WHICHARD and COZORT concur.