**AETNA CASUALTY & SURETY CO., Plaintiff,**

v.

**DANNENFELDT, et al., Defendants.**

**AMERICAN ZURICH CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**CALIFORNIA UNION INS. CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**FIREMAN'S FUND OF WISCONSIN, et al., Plaintiffs,**

v.

**ACC, et al., Defendants.**

**HARBOR INSURANCE CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**The HOME INSURANCE CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**INTERNATIONAL INSURANCE CO., et al., Plaintiffs,**

v.

**ACC, et al., Defendants.**

**LEXINGTON INSURANCE CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**NIAGARA FIRE INSURANCE CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**RELIANCE INSURANCE CO., Plaintiff,**

v.

**ACC, et al., Defendants.**

**RELIANCE INSURANCE CO. OF ILLINOIS, Plaintiff,**

v.

**ACC, et al., Defendants.**

ROBLE, et al., Plaintiffs,

v.

NATIONAL UNION FIRE INS. CO. OF
PITTSBURGH, et al., Defendants.

ROYAL INDEMNITY COMPANY,
Plaintiff,

v.

ACC, et al., Defendants.

TRANSAMERICA INS. CO., Plaintiff,

v.

ACC, et al., Defendants.

UNDERWRITERS, etc., Plaintiff,

v.

RTC, et al., Defendants.

FIRST STATE INSURANCE COMPANY,
et al., Plaintiffs,

v.

ACC, et al., Defendants.

Nos. CIV 91–223 PHX–RMB to CIV 91–
233 PHX–RMB, CIV 90–1897 PHX–
RMB, CIV 91–234 PHX–RMB, CIV 91–
235 PHX–RMB, CIV 90–1331 PHX–
RBM and CIV 91–357 PHX–RMB.
Adv. Nos. 90–487, 90–898, 90–738, 90–512,
90–800, 90–571, 90–402, 90–1074, 90–865,
90–429, 90–573, 90–637, 90–579 and 90–
139.

United States District Court,
D. Arizona.

Nov. 7, 1991.

Leonard B. Simon, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., Ronald Rus, Eric Houser, Alvarado, Rus & Worcester, Orange, Cal., Joseph W. Cotchett, Susan Illston, Cotchett, Illston & Pitre, Burlingame, Cal., for plaintiffs.

P. John Owen, James W. Howard, Kristin L. Farnen, Sarah W. Hayes, Morrison & Hecker, Phoenix, Ariz., for plaintiff Resolution Trust Corp.

Peter K. Rosen, Dennis A. Winston, Rosen & Winston, Los Angeles, Cal., for Andrew Ligget.

George W. Buehler, Miller & Nolan, Los Angeles, Cal., for Gary W. Hall.

Susan Smith, Brand & Lowell, Washington, D.C., for Judy J. Wischer and George Wischer.

Jeffrey A. Charlston, Charlston, Revich & Williams, Los Angeles, Cal., Timothy W. Evens, Sorenson, Moore & Evens, Phoenix, Ariz., for International Ins. Co. and Intern. Surplus Lines Ins. Co.

James P. Wagoner, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., for Fireman's Fund of Wisconsin and National Sur. Corp.

James D. Otto, Cummins & White, Los Angeles, Cal., for Home Ins. Co. and Niagara Ins. Co.

Stephen Youngerman, Bush, Koppel & Schweizer, Santa Monica, Cal., for Transamerica Ins. Group.

David R. Garcia, O'Melveny & Myers, Los Angeles, Cal., for California Union Ins. Co.

David A. Tartaglio, Musick, Peeler & Garrett, Los Angeles, Cal., for Reliance Ins. Co.

Randa Raulins, Niewald, Waldeck & Brown, Shawnee Mission, Kan., for Royal Ins. Co.

Lawrence Monbleau, Lawrence Monbleau, P.C., Phoenix, Ariz., for Royal Ins. Co.

Donald W. McCormick, Buchalter, Nemer, Fields & Younger, Los Angeles, Cal., for Nat. Union Fire Ins. Co. of Pittsburgh and Landmark Ins. Co.

Walter J. Lipsman, Morris, Polich & Purdy, Los Angeles, Cal., for Harbor Ins. Co.

Lane J. Ashley, Sedgwick, Detert, Moran & Arnold, Los Angeles, Cal., for American Zurich Ins. Co.

Dirk W. deRoos, Dixon & Dixon, P.C., Denver, Colo., for First State Ins. Co. and New England Ins. Co.

Michael J. Leahy, Leroy Tubb, Haight, Brown & Bonesteel, Santa Monica, Cal., for Aetna Cas. and Sur. Co.

## AMENDED MEMORANDUM OPINION[1] AND ORDER

BILBY, District Judge.

### INTRODUCTION

The plaintiffs provided excess general liability coverage to American Continental Corporation ("ACC"), its subsidiaries and affiliates, over a five-year period beginning in April 1985. They seek declarations pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. § 2201, delineating their responsibilities to ACC insureds with respect to numerous civil lawsuits.

In 1984, ACC acquired Lincoln Savings and Loan Association ("Lincoln"). The endeavor ended on April 13, 1989 when ACC and eleven Lincoln subsidiaries filed petitions under Chapter 11 of the U.S.Bankruptcy Code. Lincoln was seized the following day by federal regulators and placed in receivership under the control of the Resolution Trust Corporation ("RTC"). The five-year ACC/Lincoln enterprise generated massive civil litigation against Charles H. Keating, Jr. and a group of his associates. The majority of the civil cases have been centralized in this Court by the Judicial Panel on Multi–District Litigation as *In re ACC/Lincoln Savings and Loan Securities Litigation*, 130 F.R.D. 475 (1990).

These declaratory relief actions were filed as adversary proceedings in the ACC bankruptcy, which is also before this Court pursuant to a withdrawal of the reference from the Bankruptcy Court. This ruling is on a joint motion for summary judgment, in which the carriers argue that no coverage is available under any of thirty-one general liability policies issued by any of eighteen

carriers, for any of the specified underlying actions tendered for defense and indemnification. The motion was generated after declaratory judgment was rendered in favor of Reliance Insurance Company on the basis that a professional services exclusion in its primary general liability policy clearly and unambiguously eliminated coverage for the underlying actions. Class plaintiffs now move for reconsideration of that ruling.

The carriers' motion is premised entirely on the application of certain exclusions. All issues related to basic coverage and exclusions not examined in this joint motion are reserved.

The joint motion is opposed by former ACC/Lincoln directors and officers who are defendants in underlying actions. They are referred to collectively as "insureds." The joint motion is also contested by class plaintiffs in the underlying actions, and by RTC, which, as successor to Lincoln (also an insured), is a plaintiff and is or has been a defendant in several underlying actions. The insureds, the class plaintiffs, and RTC are referred to collectively as "respondents."

Four types of exclusions are at issue: (1) professional services, (2) directors and officers liability, (3) financial institutions, and (4) cross suits. Because the Court finds the first three categories determinative, issues raised by the cross-claims exclusions are not addressed.

The language of the exclusions varies from policy to policy. The policies vary with respect to the mix of exclusions they contain or incorporate. The Court holds that each of the thirty-one policies contains or incorporates one or more exclusions which effectively eliminate the underlying actions from coverage.

### NATURE OF THE UNDERLYING ACTIONS

The following underlying actions have been tendered for defense and indemnifica-

---

**1.** This supercedes the Memorandum Opinion and Order issued on October 10, 1991, in which the Court instructed the Insurers to provide a copy of the operative complaint in *Unocal v.*

*Milken.* This opinion differs only in that it contains the Court's opinion with respect to that action.

tion, and are before this Court.[2]

(1) *Shields, et al. v. Keating, et al.*, Civ 90–566 through 570, 90–573, 90–574, and 90–760 PHX–RMB ("*Shields*") is a consolidated class action brought by an estimated 23,000 plaintiffs who purchased ACC securities. It alleges violations of the Securities Exchange Act of 1934, the Securities Act of 1933, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and the Arizona Racketeering Act, A.R.S. § 13–2301 *et seq.*

(2) *Roble, et al. v. Arthur Young & Co., et al.*, Civ 90–1270 PHX–RMB ("*Roble*") is a consolidated class action which alleges fraud, negligent misrepresentation, and violations of the California Corporations Code.

(3) In *Yahr, et al. v. Lincoln Savings, et al.*, Civ 90–571 and Civ 91–271 PHX–RMB ("*Yahr*") approximately 100 subordinate debenture purchasers make allegations parallel to those in *Shields* and *Roble* and seek recovery under the Exchange Act and RICO.

(4) In addition to *Shields, Roble* and *Yahr*, there are two actions brought by individual bondholders which make substantially similar allegations.[3]

(5) *Resolution Trust Corp. v. Keating, et al.*, Civ 89–1509 PHX–RMB ("*RTC v. Keating*"): As receiver for Lincoln, RTC seeks recovery for multiple counts including federal and state RICO, common law fraud, civil conspiracy, breach of fiduciary duties to Lincoln, and gross negligence.

(6) *People of the State of California v. Charle s H. Keating, Jr., et al.*, Civ 90–733 PHX–RMB ("*People v. Keating*") alleges violations of California's Corporate Securities Law of 1968, California Corporations Code § 25000 *et seq.*

(7) *H. Garrett Frey, et al. v. Hotel Pontchartrain Ltd. Partnership, et al.*, Civ 90–1271 PHX–RMB ("*Frey*") was brought by a group of investors in the Hotel Pontchartrain Limited Partnership. It incorporates many allegations from *Shields* and alleges violations of federal securities laws, federal and state RICO, fraud and negligent misrepresentation, breach of contract, and unjust enrichment.

(8) *Taiyo Development U.S.A., Inc. v. Amcor Investments Corp., et al.*, Civ 89–1231 PHX–RMB, Adversary No. 90–377 ("*Taiyo*") was filed against several Lincoln subsidiaries and alleges fraud in the inducement, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, conspiracy, negligent misrepresentation, and breach of contract, arising out of a partnership agreement among the parties.

The complaints are lengthy and detailed; several exceed two-hundred pages. *Shields, Roble, Yahr, RTC v. Keating*, and *People v. Keating* arise out of essentially the same facts. The gravamen of the wrongdoing alleged is critical to this joint motion, and is summarized in the following excerpts:

> [To] implement and perpetuate their massive scheme or artifice to defraud, the officers and directors of ACC and its subsidiaries, including ... Lincoln devised a fraudulent scheme to ...
>
> (i) sell in excess of $500 million principal amount of ACC's debentures and millions of dollars worth of preferred stock,
>
> (ii) artificially inflate the price of ACC's publicly traded securities (of which certain defendants owned millions of shares),
>
> (iii) allow certain defendants to obtain exorbitant and excessive salaries and

**2.** *Unocal Corporation, etc. v. Milken, et al.*, U.S. District Court (C.D.Cal.) Case No. Civ 90–1281 TJH (Tx) is a shareholder derivative action in the Central District of California which alleges RICO and securities law violations in connection with a corporate takeover by Drexel Burnham Lambert, Inc. Charles H. Keating, Jr. is the only ACC/Lincoln figure named as a defendant. Although the allegations against Keating, Jr. are far less detailed than those in the underlying actions before this Court, the claims appear to be a facet of the *Shields* "Drexel Daisy Chain" claims, to the effect that Keating allegedly used funds under his control to swap favors with Drexel, thereby providing material assistance to the disputed Unocal takeover.

**3.** *Joyce I. Craig v. Lincoln Savings and Loan, et al.*, Civ 90–572 PHX–RMB; *Anabelle Datzker, et al. v. Lincoln Savings and Loan Association, et al.*, Civ 90–891 PHX–RMB.

compensation packages and to sell their personal common stock holdings at artificially inflated prices,

(iv) artificially inflate the publicly reported and regulatory earnings, net worth and assets of ACC/Lincoln, and

(v) circumvent federal and state regulations relating to the prudent, safe and sound operation of a federal insured savings and loan ...

*Shields* Sixth Amended Consolidated Class Action Complaint, Paragraph 2, p. 2–3.

Stripped to its essence, the fraudulent scheme involved three contrivances:

(1) acquiring control of Lincoln by making misrepresentations to regulatory authorities;

(2) subjecting Lincoln to numerous fraudulent and abusive transactions; and

(3) maintaining control of Lincoln and precluding Lincoln from obtaining regulatory protection by making misrepresentations to regulatory authorities.

*RTC v. Keating*, Second Amended Complaint, Paragraph 49, p. 15.

Although *Frey, Taiyo,* and *Unocal* concern circumscribed transactions, they are similar in respects material to the issues presented.

## THE POLICY EXCLUSIONS

### Professional Services

These examples are typical of those contained in the policies.

### PROFESSIONAL LIABILITY EXCLUSION ENDORSEMENT

[T]his policy shall not apply to any act, error, omission, malpractice or mistake of professional nature committed by or alleged to have been committed by the insured or any person for whom the insured is legally responsible and arising out of the insured activities.

National Union Policy BE 1320794, Endorsement # 12.

### ABSOLUTE PROFESSIONAL LIABILITY EXCLUSION

[T]his policy does not apply to any liability arising out of any claim made against any insured caused or alleged to have been caused by the rendering of or failure to render any professional services performed by or on behalf of any insured ... including but not limited to ... Directors and Officers.

International Insurance Company, Policy 5310007749 and International Surplus Lines Insurance Company, Policy 5310011295.

### ERRORS AND OMISSIONS EXCLUSION

This policy does not apply to any liability for any actual or alleged: errors, misstatements or misleading statements, acts or omissions, or neglect, or breach of duty by the insured individually or collectively, or by any other person for whose acts the insured is legally liable, arising out of the discharge of duties for professional services rendered or which should have been rendered in the conduct of the insured's operations.

California Union Insurance Company Policy ZCX009524, Endorsement # 13.

### Directors and Officers

Many policies contain an exclusion identical or similar to one of the following.

### DIRECTOR'S AND OFFICER'S LIABILITY EXCLUSION

[T]his policy does not apply to any or all claims made against an insured, its directors, or officers by reason of any actual or alleged error or mis-statement or neglect or breach of duty by the directors or officers in the discharge of their duties, individually or collectively, or any other matter excluded by the terms and conditions of this policy claimed against them solely by reason of their being directors and officers of an insured.

New England Insurance Company, Policy EX 000176.

## DIRECTORS AND OFFICERS LIABILITY EXCLUSION

[T]his policy shall not apply to any Director and/or Officer of the Named Insured by reason of any wrongful act committed in their capacity as a Director and/or Officer of the Named Insured. It is further agreed that the term "wrongful act" shall be defined as, but not limited to, any breach of duty, neglect, error, misstatement, misleading statement, omission or other act actually done or wrongfully attempted by any Director and/or Officer claimed against them solely by reason of their capacity as such.

National Union Fire Insurance Company of Pittsburgh, PA, Policy BE 1320527.

### Financial Institutions

These exclusions fall in two categories. The following are typical of the broader formulation:

## FINANCIAL INSTITUTIONS ENDORSEMENT

[T]his policy does not apply:

4. To claims arising out of error or omission or a mistake committed by or on behalf of the insured in the conduct of any of the insured's business activities or the rendering or failure to render any professional service.

International Insurance Company Policy 5310007749 and International Surplus Lines Insurance Company Policy 5310011295.

## FINANCIAL INSTITUTIONS AMENDATORY ENDORSEMENT

[T]his policy shall not apply to any liability:

(4) Arising out of any negligent act, error, omission or breach of duty in performing or failure to perform banking or fiduciary services, or in giving financial, economic or investment advice, or in rendering investment, advisory, or management services ...

New England Insurance Company Policy EX 000176, Endorsement # 21.

Several policies contain a narrower endorsement like this one:

## FINANCIAL INSTITUTIONS ENDORSEMENT

[T]his policy shall not apply to:

(b) Personal Injury or Property Damage to or arising out of any property held by or in the case, custody or control of the Insured while the Insured is acting in any fiduciary capacity;

(d) any liability arising out of any act, error, mistake, or omission of any Insured or any agent or sub-agent of any Insured while acting in any fiduciary capacity.

National Union Fire Insurance Company of Pittsburgh, PA, Policy BE 1320527.

### ANALYSIS

The insurers contend that every policy contains one or more exclusions which, when read standing alone and/or in combination with others, and viewed in the context of the policy as a whole, unambiguously exclude coverage for each underlying action.

■ The burden is on the insurer to demonstrate that an exclusion eliminates coverage. "If an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation." *Coconino County v. Fund Admrs. Ass'n,* 149 Ariz. 427, 431, 719 P.2d 693 (App.1986); *Continental Cas. Co. v. Richmond,* 763 F.2d 1076 (9th Cir.1985).

■ The insurers stand on the plain language of their exclusions, arguing that when read against the underlying complaints, the result is clear. Provisions of insurance contracts must be construed according to their plain and ordinary meanings. *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). Individual clauses must be read in the context of the policy as a whole "in order to give reasonable and harmonious meaning and effect to all of its provisions." *Federal Ins. Co. v. P.A.T.*

*Homes, Inc.,* 113 Ariz. 136, 139, 547 P.2d 1050 (1976) *overruled on other grounds by Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984).

## I. The Insureds' Reasonable Expectations

"Where there is no dispute as to material facts, the validity of [an] exclusion is a question of law, not fact, and is appropriate for summary judgment." *Scottsdale Ins. Co. v. Monares,* 153 Ariz. 9, 11, 734 P.2d 106 (App.1986), (citing *Northern Insurance Company of New York v. Superior Court of Pima County,* 104 Ariz. 235, 450 P.2d 693 (1969)).

Respondents first argue that the insurers have not complied with this Court's order that they produce certain documents to the U.S. District Court Document Depository, the discovery facility created for the underlying actions. The carriers respond that the documents have been deposited. The Court holds that this debate is immaterial with respect to the policies themselves. The insurers' motion was accompanied by a copy of each policy, authenticated by a sworn declaration from a company representative competent to testify. There is no indication whatsoever that the policies actually issued to ACC differ in any respect from those before the Court.

Respondents argue that discovery has only begun in the declaratory relief actions, and that summary judgment is therefore inappropriate. They submit that the policy exclusions cannot be construed as a matter of law because questions of fact exist which demand discovery, intimating that the exclusions do not comport with the insureds' expectations of coverage.

■ Arizona law clearly recognizes the reasonable expectations of insureds. Insureds "are not bound to unknown terms which are beyond the range of reasonable expectation ..." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984) (citing Restatement (Second) of Contracts § 211, Subsection (3)). But this doctrine has limits. "[S]ince most insureds develop a 'rea-

sonable expectation' that every loss will be covered by their policy ... The reasonable expectation concept must be limited by something more than the fervent hopes usually engendered by loss ... The expectations to be realized are those that 'have been induced by the making of a promise.'" *Id.* at 390, 682 P.2d 388.

The Arizona Supreme Court has clarified the scope of the *Darner* doctrine:

Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a *limited* variety of situations:

(1) Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured ...

(2) Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage ...

(3) Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured ...

(4) Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy ...

*Gordinier v. Aetna Casualty & Surety Co.,* 154 Ariz. 266, 273, 742 P.2d 277 (1987).

[5] Class plaintiffs argue that no one has had the opportunity to question the insureds about the insurance. Although the implication appears to be that the insureds might offer testimony concerning expectations of coverage under the policies which are inconsistent with the plain language of the policies themselves, the respondents make no concrete offer of what they expect to learn which would bear importantly on the issues before the Court. More importantly, the insureds themselves

are active parties to these declaratory relief actions. They are represented by counsel and fully able to come forward with sworn statements avowing that they were led to believe the policies offered coverage contrary to that stated in each policy. No allegations of this type have been made, either in answer to the complaints for declaratory relief, in pleadings, or by way of affidavit in response to these summary judgment motions. In the many months that these declaratory relief actions have been pending, they have made no allegations and submitted no evidence concerning promise-induced expectations which differ in any respect from the provisions of the insurance contracts.

The only attempted showing of evidence is submitted by class plaintiffs. It is an affidavit by Robert J. Hubbard, Jr., an insured and named defendant in the underlying actions, which was filed in the declaratory judgment action on a primary policy issued by National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). Hubbard declares that he has been an ACC director since 1981, and in 1986 became a director and officer of ACC's insurance group of companies. With respect to the National Union primary policies in effect from April 7, 1985 through April 7, 1989, he avows that the insureds "were aware that National Union's policies contained coverage for various claims which might be asserted by the public in connection with our advertising activities." Hubbard Declaration, p. 3, Exhibit B to Declaration of Ronald Rus in Opposition to Insurers' Motions. The declaration has no specific bearing on the policies at issue here.

Hubbard's affidavit does figure into a more general argument advanced by respondents with respect to the broad exclusions, such as the broader formulation of the financial services exclusion, and as to the operation of exclusions in combination. To paraphrase their argument: The primary policies have been held, by this Court and by Judge Wilson in the Central District of California, to provide coverage for advertising liability. The underlying cases allege unfair competition which is encom-passed within advertising liability. The carriers now argue that business torts are excluded. Unfair competition is coextensive with business torts. If business torts are excluded, all advertising coverage is excluded, rendering the benefit of the insureds' bargain illusory. RTC Memorandum in Opposition, p. 2.

This reasoning fails for several reasons. First, the policy exclusions do not purport, by their plain language, to encompass "all business torts." Second, advertising liability typically embraces causes of action which may not necessarily be affected by the exclusions at all. Misappropriation of ideas and infringement of copyright or trademark are examples. Cf. *Aetna Casualty & Surety Co. Inc. v. Centennial Ins. Co.*, 838 F.2d 346 (9th Cir.1988). Third, "parties to an insurance contract may contract for any lawful coverage, and the insurer has a right to limit its liability by imposing conditions and restrictions on its obligation, provided those restrictions are not inconsistent with public policy." *Security Ins. Co. of Hartford v. Andersen*, 158 Ariz. 426, 430, 763 P.2d 246 (1988). The parties were free to bargain for limitations on the excess coverage which narrowed the coverage offered underneath. Finally, the Hubbard declaration proclaims only a subjective expectation of coverage with respect to an underlying primary policy. That is insufficient. *See Darner Motor Sales*, 140 Ariz. at 390, 682 P.2d 388.

Next, counsel for respondents argue that the declarations submitted by the insurers attest to total premiums of $14,-135,381.00 paid over the five-year period. Counsel suggest that the magnitude of this number, standing alone, creates a question of fact which requires further discovery into the policy files. The carriers respond that the premiums were based on physical hazards such as square-footage of office space covered and numbers of vehicles insured.

The record actually shows that of total premiums paid, $6,114,297.00 was for primary policies which are not at issue here. Therefore, the total premiums actually paid

for the policies under consideration here was $8,021,084. These premiums purchased total excess liability coverage of $275 million over five years. Thus, ACC paid $1 million for every $34 million of umbrella coverage.

The carriers have submitted ACC's "1988–1989 Umbrella Application" accompanied by the Declaration of Jeffrey A. Charlston, counsel for International Insurance Company and International Surplus Lines Insurance Company, which provided first-year excess coverage from 1988 into 1989. Charlston avers that the application was produced on August 29, 1990 pursuant to a deposition of the Custodian of Records of G.J. Sullivan Co. of Arizona, the excess broker utilized by ACC and Insurance West, Inc. ("Insurance West") and represents a business record of Insurance West. The deposition transcripts are part of the record. The respondents move to strike the insurance application on the grounds that it has not been properly authenticated, and has not been produced to the Document Depository. The carriers respond that it has been deposited. Again, whether and when the application was deposited is unimportant because it has been produced to all respondents in these summary judgment proceedings, and has drawn not a single substantive objection from the insureds themselves. They do not impugn its accuracy, nor do they make any tangible challenge to its authenticity.

Moreover, the insurance application is offered for the purpose of establishing facts with which this Court is already quite familiar, having presided over the ACC bankruptcy proceeding: ACC had over fifty subsidiaries; its diverse subsidiaries and affiliates were doing business at dozens of locations in Arizona, California, Colorado, Texas, and elsewhere; it maintained a large fleet of vehicles; it owned and operated a half dozen aircraft.

None of the circumstances described in *Gordinier* are present here. In the last analysis, the following facts are dispositive. The policy endorsements containing these exclusions are clear and readily observable. Their meaning is plain, and they are not hidden within the boilerplate. The insureds were not average consumers such as the plaintiffs in *Darner* or its progeny. The insureds ran a multifaceted business, which included insurance company subsidiaries. Their insurance agency subsidiary, Insurance West, purchased their insurance. The insureds have proffered no evidence which purports to explain why they bought and paid for these policies, with these plain and prominent exclusions, if it was not the coverage they bargained for or expected. A party may not resist a motion for summary judgment by general statements or allegations of its counsel. *U.S. Fidelity & Guar. v. Advance Roofing*, 163 Ariz. 476, 788 P.2d 1227 (App.1990). Nor may the Court invent an ambiguity where none exists. *Security Ins. Co.*, 158 Ariz. at 428, 763 P.2d 246.

The Court holds that the respondents have not demonstrated the existence of a material question of fact. The interpretation of these policy exclusions is therefore a matter of law to be determined by the Court. The Court further holds that the policy exclusions are not ambiguous by virtue of their relation to one another, or their relation to the coverage provided in the underlying primary policies.

## II. Financial Institutions Exclusions

▆▆▆ The broadly framed versions of this exclusion refer to banking services, investment services, and/or business activities.

Class plaintiffs submit the Declaration of one Donald A. Hall, who renders an opinion based on experience as an insurance analyst, that the Financial Institutions Endorsement in California Union Policy ZCX010125 is "exceptionally broad as written" and would afford no coverage "if literally applied," because "a corporate insured has no business other than 'Business Activities.'" These corporate insureds, however, ran multiple businesses. This exclusion applies to the business of the financial institution subsidiary—Lincoln. Respondents' arguments with respect to the broadly formulated versions of this exclusion fail for the same reasons discussed in

connection with their reasonable expectations.

Respondents are correct that the narrower version of this exclusion does not clearly and distinctly exclude the coverage for any of the underlying complaints.

### III. Professional Services Exclusions

██ The underlying complaints allege that the wrongdoing arose out of a massive scheme involving the management of a savings and loan and the sale of subordinated debentures. By the very nature of their arguments in opposition, the respondents concede that the weight of these allegations fall squarely within the ambit for the professional services exclusions.

To avoid the sweep of the exclusions, however, respondents focus down microscopically on the actual bond sales, contending that they were events in isolation which amounted to nothing more than simple sales of commodities.

The insurers have no duty to defend unless the complaints present a potential for liability. To prevail, respondents must therefore show that the complaints harbor potential liability arising out of services which were not professional.

To place this assertion in proper perspective it is necessary once again to refer to the allegations as they actually appear in the underlying complaints.

> [D]efendants sold the debentures by 'bait and switch' techniques at Lincoln's 29 branch offices, using personnel who appeared to be employees of Lincoln and who were not licensed to sell securities. The defendants caused ACC/Lincoln to advertise certificates of deposit and the debentures in various newspapers, including *Los Angeles Times*. Purchasers of the debentures, many of whom were elderly persons who came into Lincoln's offices to make federally insured deposits or to buy federally insured CDs as a result of solicitation letters and/or telephone calls made to them by ACC/Lincoln employees, were given a uniform, pre-arranged, 'canned' presentation by the Lincoln sales force. The standard sales pitch included representations that the debentures were just as safe as federally-insured CDs, except that they paid slightly higher interest, that Lincoln, itself federally insured, would stand behind the debentures ...

*Shields* Sixth Amended Complaint, Paragraph 115. *Roble* Amended Complaint, Paragraph 105.

In opposition to this joint motion, the respondents contend the bond sales representatives were merely automatons. They were untrained, and given no discretion. They were order takers. They followed canned scripts. They did not give advice or perform professional services. In fact, they were incapable of doing so.

██ At issue is whether a bond sales representative in a savings and loan new accounts department or teller window performs a professional service. It is a question of law.

"A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *Marx v. Hartford Accident & Indemnity Company*, 183 Neb. 12, 157 N.W.2d 870, 872 (Neb.1968).

Plaintiffs incorrectly assert that the definition of professional services has been narrowed since the Nebraska Supreme Court decision in *Marx v. Hartford*. The *Marx* definition has been applied to many different circumstances, but it has not been narrowed. The basic *Marx* principles remain sound.

Many cases cited by respondents construe professional malpractice policies, on the theory that "professional services exclusions are the mirror image of professional malpractice coverage." Defendant's Memorandum in Opposition at p. 11. This reasoning is misplaced. The policies at issue insured against malpractice claims with respect to specific professions. For example, *Mastrom, Inc. v. Continental Casualty Co.*, 78 N.C.App. 483, 337 S.E.2d 162 (1985) and *George Muhlstock & Co. v. American Home Assur. Co.*, 117 A.D.2d 117, 502 N.Y.S.2d 174 (1st Dept.1986) con-

strued accountants' professional liability policies. An attorney's malpractice policy was at issue in *General Accident Ins. Co. v. Namesnik*, 790 F.2d 1397 (9th Cir.1986), corrected, reh den. 799 F.2d 539 (9th Cir. 1986).

A general liability policy affords a different and broader sphere of coverage. A professional services exclusion within a general liability policy may *exclude* a broader range of activities than are *included* within the basic coverage of a malpractice policy in the first instance. The criteria for interpretation necessarily differ. To determine whether a risk falls within the basic coverage of a professional malpractice policy, the inquiry centers on the particular profession for which the policy provides coverage. To determine whether a risk is within a professional services exclusion, and therefore taken out of the basic coverage of a general liability policy, a generic definition of "professional services" is applied to a far broader range of activities, producing understandably disparate interpretations in the case law.

Several cases cited by the carriers construe professional services exclusions within general liability policies, and are more to the point. A decision to foreclose on a loan customer was held a professional service in *State Street Bank and Trust Co. v. INA Ins. Co.*, 207 Ill.App.3d 961, 153 Ill.Dec. 327, 567 N.E.2d 42 (1991). The court construed an "office building policy" which covered personal injury and property damage and contained this exclusion: "[I]nsurance shall not apply with respect to any professional service." The court observed: "In construing exclusions such as this, courts have adopted an expansive definition of the term 'professional service.' The term is not limited to services performed by persons who must be licensed by a governmental authority in order to practice their professions. Rather, it refers to any business activity conducted by the insured which involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual in nature." *See also American Fellowship Mutual Insurance Co. v. Ins. Co. of North American*, 90 Mich.App. 633,

282 N.W.2d 425 (1979). RTC argues that these were "office building policies" which did not cover advertising liability, but this goes to whether the exclusions were inconsistent with the underlying coverage. That was not an issue in those cases, and has already been addressed here.

The case law is in accord that, "In determining whether a particular act is of a professional nature or a 'professional service' we must not look to the title or character of the party performing the act, but to the act itself." *Marx*, 157 N.W.2d at 871–872. The act itself is not viewed in isolation. Courts consistently consider the context of the business or profession in which it is performed. For example, in *Marx*, an employee mistakenly refilled a hot water sterilizer with benzene instead of water. The resulting explosion caused property damage, but the court observed: "No patient was present or being treated." 157 N.W.2d at 871. In *Multnomah County v. Oregon Automobile Ins. Co.*, 256 Or. 24, 470 P.2d 147 (1970), the court held that failure of a prison medical technician to administer insulin to a diabetic was a professional service, despite the fact that the injection required so little training the prisoner could have administered it himself. "[S]omething more was required ... the ability to determine whether [the plaintiff's] physical condition was such that an injection of insulin was required." Finally, in *Noyes Supervision Inc. v. Canadian Indemnity Co.*, 487 F.Supp. 433 (D.Colo. 1980), the court probed the oil and gas well supervision business and the employee's function within it before holding that an attempt to seal cracks in a well casing by injecting pressurized cement was not of professional nature.

In this case, the bond sales were the final juncture in a chain pursuant to which the bonds were conceived, issued, and marketed to the public through Lincoln branches. They were an integral part in marketing sophisticated investment instruments in a savings and loan. They were the ultimate link to the marketplace.

The Court finds a useful analogy in the notion of supervening cause. No interven-

ing force of unprofessional nature interrupted the normal succession of otherwise professional events. This is unlike situations in which the casters of a dialysis chair, *Duke University v. St. Paul Fire & Marine Ins. Co.*, 96 N.C.App. 635, 386 S.E.2d 762 (App.N.C.1990), or the siderail on a hospital bed, *DeMandre v. Liberty Mutual Insurance Company*, 264 F.2d 70 (5th Cir.1959), may have operated as intervening, nonprofessional causes within an otherwise professional chain of events.

The bond representatives were part of the natural progression from conception of the bonds to sale in the outlets. They themselves may have been ill-trained, or untrained, but this doesn't make the sale of bonds from Lincoln branches any less a professional service.

### IV. Directors and Officers Liability Exclusions

■■■ Respondents argue the directors and officers exclusions do not apply to the underlying actions because the director and officer defendants have not been sued for wrongs "claimed against them *solely by reason of their capacity as such.*" They contend the insureds are alleged to have acted not only as directors and officers, but also as employees, as shareholders, and/or as individuals. The difficulty lies not with the clarity of the provision, for it is not hard to contemplate the situations to which it is meant to apply—the fender bender in the company parking lot, or a tort committed in the board room but unrelated to board business.

RTC argues: "The mere fact that an individual is a director or officer does not mean that all of their alleged acts or omissions were in that capacity. Courts have frequently recognized that a director or officer may act in other capacities." RTC memo at p. 11. This does not advance RTC's position at all. The exclusion is designed to address this reality. The issue is whether the lawful authority and control conferred on the insureds by virtue of their capacity as directors and officers is the sole legal footing upon which these claims have been brought.

### Employee Capacity

Every individual ACC/Lincoln defendant named in the underlying actions is alleged to have been a director and/or officer. No employees have been sued. Although the complaints allege that the named defendants directed their employees to perform acts which advanced the wrongdoing, the liability alleged arises out of the directors' and officers' control and governance. They allegedly misused their lawful authority as directors and officers of ACC, operating concurrently as or in cooperation with directors and officers of Lincoln.

For example, in *RTC v. Keating*, each ACC/Lincoln director and officer defendant is introduced by the following description:

> Defendant.... held formal positions as director or officer of ACC, its affiliates and affiliated persons, and/or the Lincoln Subsidiaries ... At all times pertinent hereto [defendant] was a *de facto* director and a *de facto* officer of Lincoln.

Second Amended Complaint at p. 2–6.

> In addition, the complaint alleges:

> defendants ... constituted a majority of the members, both formal and *de facto*, of the Board of Directors of Lincoln and, therefore, controlled and dominated Lincoln and its business affairs and interests.

*Shields* and *Roble* make identical allegations. In addition, each complaint alleges specific duties owed Lincoln by virtue of the defendants' positions as officers and directors of a federally regulated savings and loan.

RTC cites *Curran Development Co., Inc. v. Security Insurance Company*, 194 F.Supp. 727 (W.D.Ark.1961), a coverage action which is actually a fairly good example of the type of situation to which the "solely by reason of" language is directed. The court found a question of fact as to whether a director and officer was acting "in his capacity as such" when performing electrical wiring which resulted in a wrongful death action. The underlying complaint averred that the defendant was acting as general manager of the corporation, but his

alleged negligence arose while he was acting as a tradesman.

RTC also cites *Wharton v. Fidelity–Baltimore National Bank*, 222 Md. 177, 158 A.2d 887 (Md.1960) and *Solheim v. Hastings Housing Co.*, 151 Neb. 264, 37 N.W.2d 212 (Neb.1949), which teach that where the distinction is legally significant (for purposes of interpreting rights under a stock option agreement, and under the Workmen's Compensation Act, respectively) directors are *not* employees unless the facts show that they are performing duties of employees rather than those of directors.

### Shareholder Capacity

Because *Shields* and *Roble* plead securities fraud violations, they make allegations concerning the insureds' stock holdings:

> "Because of [defendant's] stock ownership ... position as a director and an officer and ... access to material inside information about the Company, [defendant] was at all relevant times ... a 'controlling person' of ACC.
>
> The defendants ... were by reason of their stock ownership, management positions and/or their membership on the Company's Board of Directors during the time they owned ACC stock or held said positions with ACC, controlling persons of ACC/Lincoln and had the power and influence, and exercised the same, to cause ACC/Lincoln to engage in the wrongful acts complained of herein and/or participated in the wrongful acts alleged herein.

*Shields* Sixth Amended Complaint, Paragraph 22, p. 21; *Roble* Amended Complaint, Paragraph 19, p. 24 (emphasis added).

Shareholders are the owners or investors in a corporation. They may vote their shares, and they typically have a say in who runs the company. It is the board of directors, however, which makes the broad management decisions, and it is the officers who operate the corporation. *Cf.* Revised Model Business Corporation Act (1984).

The defendants' ownership of substantial shares created a personal incentive and a conflict of interest which, although legally significant under the securities laws, did not vest them with the power to control ACC/Lincoln. Their stock ownership was a vehicle which enabled profit, but it was their authority as directors or officers which engaged the engine of alleged wrongdoing. "Solely by reason of" their capacities to act as directors and officers, they were allegedly able to manipulate Lincoln for their benefit.

### Capacity as Individuals

The assertion that defendants allegedly acted as individuals is similarly unsupported by citation to authority or the complaints. As the insurers point out, if the insureds did in fact perform wrongs exclusively as individuals, they would not qualify as insureds. They are alleged to have acted in their own self-interest, but avidity is not a distinct legal capacity which bestows authority.

### Capacity as Directors of Another Corporation

Finally, RTC argues that the insureds acted in their capacities as directors of ACC rather than Lincoln when they performed the wrongdoing, and Lincoln is therefore entitled to coverage. This contention simply does not survive an analysis of the complaints, which seek recovery for violations of duties owed specifically by virtue of their positions with respect to Lincoln.

The Court holds that these exclusions are operative against the underlying complaints because the directors' and officers' alleged liability arises, if at all, "solely by reason of their capacity as such."

### V. Potential Liability for Conduct of Lower Level Employees

Finally, respondents argue that the underlying complaints present potential liability for conduct by employees other than directors and officers.

The insureds emphasize that they may be completely vindicated, and the blame for whatever went wrong with Lincoln may be

found to reside elsewhere. Class plaintiffs suggest there may be liability arising out of bond representatives' negligent misrepresentation or omissions—something as simple as a failure to hand out a prospectus. RTC points to a cross-complaint filed by defendant Star Bank in *Roble*, which alleges that clerks and new accounts representatives sold bonds, and that Lincoln employees allegedly made phone solicitations and taped brochures to their teller windows. A jury could ultimately find that the fault rests with these lower level employees, respondents argue. Therefore, the actions allege potential liability which is not completely eliminated from the exclusions.

Because of the Court's rulings with respect to the professional services exclusions and the broadly constructed version of the financial institutions exclusion, this argument cannot succeed with respect to policies which contain those exclusions. There is at least one policy, however, which contains only a directors and officers exclusion. If any of the underlying actions present potential liability arising out of wrongs performed by employees other than directors and officers, such a policy could afford coverage.

■ An insurer must defend against a claim which is potentially covered, but if the alleged facts do not bring the claim within the policy coverage, the insurer bears no obligation. *Kepner v. Western Fire Insurance Co.*, 109 Ariz. 329, 509 P.2d 222 (1973); *Baugh Constr. Co. v. Mission Ins. Co.*, 836 F.2d 1164 (9th Cir.1988). Under modern notice pleading rules, the insurers' license to rely on the pleadings is subject to exceptions. "The insurer cannot rely on the pleadings alone where the allegations are in conflict with facts known or facts reasonably ascertainable by the insurer. Further, when the allegations of the complaint are ambiguous or inadequate, the insurer must investigate facts which might give rise to potential liability." *Id.* at 1168.

■ "Generally, where there is doubt as to whether the duty to defend exists, the doubt must be resolved in favor of the insureds ..." *Walbrook Ins. Co. v. Goshgarian & Goshgarian*, 726 F.Supp. 777, 780 (C.D.Cal.1989); *Miller v. Elite Ins. Co.*, 100 Cal.App.3d 739, 757, 161 Cal.Rptr. 322 (1st Dist.1980). Nevertheless, somewhere within the facts alleged or the facts as they might evolve, there must be the potential for liability under the legal theories alleged, against the defendants who have been sued. There "is no substitute for the rule that allegations of a covered claim are essential to a determination that the insurer must defend." Windt, *Insurance Claims and Disputes* § 4.02, p. 105. "Whether the facts set forth by the parties are sufficient to show potential coverage is a matter of law." *Walbrook*, 726 F.Supp. at 780. To ascertain whether a complaint holds the potential for liability, the Court considers: (1) the facts alleged in the complaints, (2) the theories of liability alleged in the complaints, (3) the defendants against whom liability is sought in the complaints, and (4) the facts as they might potentially evolve to sustain liability under any of the theories alleged.

The massive allegations all center on this: the directors and officers of ACC and Lincoln conceived, devised, and implemented a grand scheme which damaged the plaintiffs. All of the allegations concern their management and direction and fall squarely within the directors and officers exclusions. The allegations concerning employees are, without exception, that they were directed or instructed to perform acts by the directors or officers. The following allegation is typical:

Wischer specifically instructed the Swat Team to remove all documents from Lincoln's loan files that were derogatory or negative about the loan. In particular, Wischer instructed the team to remove all notes prepared by Keating from the loan files. Judy's Swat Team subsequently followed those instructions ...

*RTC v. Keating*, Second Amended Complaint, Paragraph 385.

The Star Bank cross-claim seeks indemnification against RTC in the event it is held liable. It does not name RTC employees as defendants. It makes allegations which,

although more detailed, are nevertheless similar to those in other complaints:

> Mr. Roble testified ... that the Old Lincoln clerk told him that 'we have a better deal than CD's ... here, but you will have to talk to someone in New Accounts.'

*RTC v. Keating,* Star Bank Cross–Claim, Paragraph 30. But, like the other complaints, the cross-claim alleges:

> [T]he responsibility for selecting subordinate debenture ... representatives and for establishing the procedures for marketing, referral, and selling of subordinate debentures at Old Lincoln offices rested with Robin S. Symes and Ray C. Fidel, Executive Vice President and Senior Vice President of Old Lincoln, respectively.

*RTC v. Keating,* Star Bank Cross–Claim, Paragraph 32.

 In essence, respondents' proposal is that there may be liability on a lesser-included offense, by analogy to cases such as *Transamerica Ins. Group v. Meere,* 143 Ariz. 351, 694 P.2d 181 (1984), which held that where the complaint makes allegations which are clearly not covered, such as an intentional tort, but embraces the potential for a factual finding which is covered, such as negligence, there will be a duty to defend. When the Lincoln story unfolds at trial, the jury may hear many stories of employee wrongdoing. Lincoln employees may have been culpable and could have been sued. In fact, however, in these extensive complaints, they are nameless. The employees are not defendants. This massive litigation is not about employee wrongdoing. The claims allege director and officer error. Respondents' scenarios do not raise lesser-included offenses. Theirs is a case built on different facts against different defendants.

The insureds may successfully defend by asserting that some or all of the blame lies with their employees. If so, the directors and officers will not be liable. An insurer must defend a groundless or frivolous action if it alleges exposure within the policy coverage, but an insurer need not defend an action which does not allege potentially covered liability simply because the insured may be inculpable. *Aetna Casualty and Surety Company, Inc. v. Centennial Ins. Co.,* 838 F.2d 346 (9th Cir.1988).

Moreover, a successful defense does not result in liability, even if it lays the blame elsewhere, unless there is an affirmative claim for relief pleaded against a defendant who has been named and can answer the charges. RTC contends that Lincoln is that defendant. It "should enjoy substantial insurance coverage for what went wrong. And whatever it is, something did go wrong ... there ought to be coverage for the nature of Lincoln's exposure." Transcript of Proceedings, September 20, 1991, p. 172. RTC contends, despite the fact that it is a largely settled defendant, that it could be vicariously liable for the random, unorchestrated negligence of Lincoln employees who have not been named as defendants.

The complaints in the underlying actions are comprehensive. They are neither inadequate or ambiguous. *Baugh Constr. Co. v. Mission Ins., supra.* The 23,000–member plaintiff class alleges that they have been damaged principally through an immense fraud on the securities market. Without exception, the allegations are that the directors and officers coordinated and implemented a vast stratagem. The underlying actions at issue here have undergone many long, hard months of discovery. There have been numerous amendments to complaints. The deadline for filing cross claims and third-party claims has long passed. And yet, no direct claims, counterclaims, or third-party claims have been brought against any Lincoln employees for the type of conduct raised in opposition to this joint motion.

The Court holds that to trigger the insurers' obligation to defend under these circumstances, the respondents must make some factual showing that the lawsuits actually seek damages resulting from the negligence of Lincoln employees, rather than or in addition to, the wrongdoing of

the directors and officers. *See United States Fidelity & Guar. Corp. v. Advance Roofing & Supply Co.,* 163 Ariz. 476, 788 P.2d 1227 (App.1989), *review den.* 1989 WL 151009, 1990 Ariz. LEXIS 66 (Ariz.1990). No showing has been made. An insurer need not defend a claim when the potential for coverage is "tenuous or farfetched." *Lassen Canyon Nursery, Inc. v. Royal Ins. Co. of North America,* 720 F.2d 1016, 1018 (9th Cir.1983); *Walbrook v. Goshgarian, supra.*

It is onerous to hold that no coverage exists under these policies in light of the massive wrongdoing alleged. If there was a wrong, this does not help to right it. If there was no wrong, this does not help the insureds obtain a defense. Nevertheless, the insurers' obligations do not arise out of federal securities or RICO laws, or any of the substantive law alleged in any of these complaints. Their obligations arise out of the contracts they entered into with their insureds. They bargained for a certain exposure. If the complaint does not allege potential liability within that exposure, they are not obligated to step forward.

## CONCLUSION

The Court holds that the exclusions are not ambiguous when read in the context of the policies as a whole, nor are there inconsistencies among the policies which create ambiguity. The Court further holds that each policy contains one or more exclusions which effectively exclude coverage for the underlying actions. The Court holds, in addition, that where indicated below, the policies contain clear and unambiguous language which incorporate the exclusions of the base excess policy for that year, and/or limit coverage to claims covered by the base policy.

### YEAR 1

(1) NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

Policy BE 1320527

Directors and Officers

### YEAR 2

(1) NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A

Policy BE 1320623

Directors and Officers

Professional Services

(2) NEW ENGLAND INSURANCE COMPANY

Policy EX 000176

Directors and Officers

Financial Institutions

(3) LANDMARK INSURANCE COMPANY

Policy FE 4002307

Directors and Officers

Financial Institutions

Incorporates National Union BE 1320623

(4) LEXINGTON INSURANCE COMPANY

Policy 5523065

Incorporates National Union BE 1320623

(5) ROYAL INSURANCE COMPANY

Policy RED 103477

Professional Services

Incorporates National Union BE 1320623

### YEAR 3

(1) NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

Policy BE 1320794

Professional Services

(2) LANDMARK INSURANCE COMPANY

Policy FE 4002321

Incorporates National Union BE 1320794

(3) CALIFORNIA UNION INSURANCE COMPANY

Policy ZCX010125

Directors and Officers

Professional Services

Financial Institutions

Incorporates National Union BE 1320794

(4) ROYAL INSURANCE COMPANY

Policy RED 103948

Professional Services

Incorporates National Union BE 1320794

**502**

(5) NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
Policy 3070543
Incorporates National Union BE 1320794
(6) FIREMAN'S FUND INSURANCE COMPANY
Policy XXK1876358
Incorporates National Union 3070543
Royal RED 103948
Cal Union ZCX010125
Landmark FE 4002321
National Union BE 1320794
(7) NEW ENGLAND INSURANCE COMPANY
Policy EX 000185
Directors and Officers
Financial Institutions
Incorporates National Union BE 1320794
(8) TRANSAMERICA INSURANCE COMPANY
Policy XLX1298682
Directors and Officers
Financial Institutions
Incorporates National Union 3070543
Royal RED 103948
Cal Union ZCX010125
Landmark FE 4002321
National Union BE 1320794
(9) CALIFORNIA UNION INSURANCE COMPANY
Policy ZCX009524
Directors and Officers
Professional Services
Financial Institutions

### YEAR 4

(1) INTERNATIONAL INSURANCE COMPANY
Policy 5310007749
Professional Services
Financial Institutions
Incorporates National Union GLA2496293
(2) HOME INSURANCE COMPANY
Policy HXL1644364
Professional Services
Financial Institutions
Incorporates International 5310007749

(3) RELIANCE INSURANCE COMPANY
Policy NV 1253420
Incorporates International 5310007749
(4) ROYAL INSURANCE COMPANY
Policy RED 104174
Professional Services
Incorporates International 5310007749
(5) AETNA CASUALTY AND SURETY COMPANY
Policy 18XN782SCA
Incorporates International 5310007749
(6) NEW ENGLAND INSURANCE COMPANY
Policy EX 001157
Directors and Officers
Incorporates International 5310007749
(7) AMERICAN ZURICH INSURANCE COMPANY
Policy CEO145028300
Incorporates International 5310007749
(8) FIREMAN'S FUND INSURANCE COMPANY
Policy XXK1876338
Incorporates International 5310007749
(9) NIAGARA FIRE INSURANCE CO.
Policy ERX000142
Incorporates International 5310007749
(10) TRANSAMERICA INSURANCE COMPANY
Policy XLX1299169
Incorporates International 5310007749

### YEAR 5

(1) INTERNATIONAL SURPLUS LINES INSURANCE COMPANY ("ISLIC")
Policy 5310011295
Professional Services/Directors and Officers
Financial Institutions
Incorporates Reliance NGA149448100
(2) RELIANCE INSURANCE COMPANY OF ILLINOIS
Policy NUA 125342001
Incorporates ISLIC 5310011295
(3) FIRST STATE INSURANCE COMPANY
Policy FL0000400
Directors and Officers
Financial Institutions
Incorporates ISLIC 5310011295

(4) LEXINGTON INSURANCE COMPANY

 Policy 5567185

 Directors and Officers

 Professional Services

 Financial Institutions

 Incorporates ISLIC 5310011295

(5) HARBOR INSURANCE COMPANY

 Policy HI238871

 Professional Services

 Financial Institutions

 Incorporates ISLIC 5310011295

(6) FIREMAN'S FUND INSURANCE COMPANY

 Policy XXK1905506

 Incorporates ISLIC 5310011295

THEREFORE, IN CONSIDERATION OF THE FOREGOING, IT IS ORDERED that Summary Judgment is GRANTED as to each of the insurers on the stated policies, based on the provisions of the exclusions listed above.

IT IS FURTHER ORDERED that in order to permit a uniform appeal on the issues presented, class plaintiffs' Motion to Intervene in *Reliance v. ACC* is GRANTED.

IT IS ORDERED that class plaintiffs' Motion to Reconsider the *Reliance v. ACC* ruling with respect to professional services is DENIED.

IT IS ORDERED that Respondents' Motion to Strike the Declaration of Jeffrey A. Charlston is GRANTED with respect to Exhibits C and D, and DENIED with respect to Exhibits A and B.

IT IS ORDERED that Insurers' Motion to Strike the Declaration of Ronald Rus is DENIED.

IT IS ORDERED that Insurers' Motion to Strike the Declaration of Donald L. Hall is DENIED.